In re Lee GALLAGHER, a/k/a Lee O. Gallagher; Lee Olivieri Gallagher; Lena Gallagher, Debtor.

CALUMET NATIONAL
BANK, Plaintiff,

v.

Lee GALLAGHER, a/k/a Lee O. Gallagher, et al., Defendant.

Bankruptcy No. 85–60820.
Adv. No. 85–6085.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

April 22, 1987.

D. Baker, Gary, Ind., for debtor/defendant Lee Gallagher (Gallagher).

S. Burke, Munster, Ind., for plaintiff Calumet Nat. Bank (Calumet).

Memorandum Decision and Order Dismissing Complaint to Determine Debt Non-Dischargeable Under § 523(a)(2)(B)

FRANCIS G. CONRAD, Bankruptcy Judge.*

This matter is before us on the complaint of Calumet asking us to deny a discharge

* Sitting by special designation.

of Gallagher's debt to it on the ground that Gallagher submitted false financial statements.

This adversary proceeding was instituted by the complaint, filed August 15, 1985, to determine the dischargeability of Gallagher's indebtedness to Calumet.[1] Pre-Trial Statements were filed and a Bench Trial was held on February 11, 1987. After receiving evidence and hearing oral argument, decision was reserved.

## FACTS

The facts are not unduly complicated. On December 1, 1982, Calumet lent Gallagher and her late husband, Dr. Gallagher, $10,000.00. The terms included a March 1, 1983 due date, and interest at sixteen percent (16%). The promissory note was signed by Gallagher and her husband. Thereafter, the note was renewed every ninety (90) days at varying rates, with little principal reduction. Dr. Gallagher died on April 9, 1985, and on May 26, 1985, the note, with a balance of $8,400.00, was not renewed by Calumet. Shortly thereafter, Gallagher filed Chapter 7 Bankruptcy.

Personal financial statements, signed by both Gallaghers, were provided to Calumet on November 30, 1982, October 10, 1983, and January 30, 1985. Gallagher, from knowledge acquired after her husband's death, does not now dispute Calumet's contention that the financial statements materially misrepresented the financial condition of the debtor and her late husband. Gallagher testified that she knew little about her family's financial affairs and nothing of her husband's financial affairs concerning his dental practice. For over thirty (30) years, Gallagher's husband controlled both family and business financial matters, and if her husband "asked her to sign, she signed." She was not sure whether the financial statements were completed when she signed them, although they do show that she completed some of the peripheral non-financial data[2] on the January 30, 1985 financial statement.

She claims she never read the financial statements and did not know their purpose. From the evidence at trial, it is obvious to us that Gallagher did not complete the initial financial statement. Later financial statements, including the January 1985 financial statement, were completed by at least two (2), and possibly three (3), different individuals, one of whom was Gallagher. The quantitative data on all three financial statements was completed by the same individual, which could have been either Dr. Gallagher or his secretary. There was no testimony contradicting Gallagher's denial that she did not fill in any of the quantitative financial data on the financial statements. Gallagher thinks they were filled in by her husband. With no evidence to the contrary, we find that Gallagher's deceased husband completed the quantitative financial data on the financial statements.

Testimony from a former Calumet officer described the procedures he used to approve the initial loan to the Gallaghers. The proposed loan to the Gallaghers exceeded his lending authority, so, in accordance with bank procedures, he relayed the financial data from the November 30, 1982 financial statement to a senior officer. Based on that financial statement, the senior officer approved the loan. Inquiry by the Court informed us that a credit check was performed before the loan was made

---

1. We have jurisdiction over the subject matter of, and the parties to, this proceeding pursuant to 28 U.S.C. § 1334(b) and the authority to enter a final order in this core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I). *See, Merchants National Bank & Trust Co. of Indianapolis v. Pappas (In the matter of Pappas)*, 661 F.2d 82, 86 (7th Cir.1981) (in a case interpreting the predecessor to § 523(a)(2), § 35(a)(2), held that the bankruptcy court had exclusive jurisdiction to determine the meaning of false pretenses and false representations without having to look to Indiana State law); *See also, Sears Roebuck and Co. v. Faulk (In re Faulk)*, 69 B.R. 743, 748–49 (Bankr.N.D.Ind.1986) (because of the slight changes between § 523(a)(2) and its pre-Code predecessor, *Pappas, supra*, remains the controlling case holding under the 1978 Code).

2. On the financial statement forms, non-financial data include: name, address, and personal and general information about wills, lawsuits, social security numbers, partnership interest, bank accounts, and bankruptcy.

and had it been negative, the money would not have been lent to the Gallaghers. He further testified that he checked a reference source provided by the Gallaghers, and otherwise did not discover anything negative about the Gallaghers.

On direct examination by Calumet's counsel, Gallagher testified she knew personally about the existence of some of the specific assets listed in the financial statements, however, she was generally ignorant about Dr. Gallagher's dental business and their personal financial affairs. For instance: NIPSCO and Gary National Bank stock, listed on the financial statements as being owned by Gallagher, were in fact owned by her mother with right of survivorship in Gallagher. Gallagher thought she owned them, but later understood that she was only to receive them upon her mother's death; she claims several "E" bonds listed on the financial statements were not found after her husband's death. She thinks he cashed them in, but she had no real evidence on the subject; she believes her house is worth $120,000.00; a post-petition appraisal, albeit a poor one, states the house was worth $75,000.00 on the date of her husband's death; a diamond is listed in the financial statement as being worth between $15,000.00 and $25,000.00. Gallagher testified that it was lost on the day of her husband's death and that she could not collect on the insurance for this loss because the insurance had lapsed for nonpayment of its premium.

Suffice it to say, the evidence goes on and on about what Gallagher believed and what reality was. She may have known they had loans, debts for their children's college education, and other general matters; however, we find that she did not know about the specifics of her husband's or her own financial affairs. Our finding is corroborated by the loan officer's testimony that characterized Gallagher's status as that of a wife who did the running around (errands) for a typical small business owner. She may have been fooled by her husband, maybe even by herself, and, while we hesitate for literary purposes to state this almost oxymoron, it is clear to us that Gallagher hadn't the foggiest idea what was going on in her financial environment.

Other evidence shows that the initial purpose of the loan was to consolidate bills and pay for a daughter's education. The renewal a year later expressed the loan's purpose to be for the dental business, while the January, 1985 renewal expressed the purpose was, again, to consolidate bills.

Gallagher's sole source of income and support was from her husband's dental practice. At no time, either prior to or during the time the loan was made and renewed, was Gallagher employed. In fact, with the exception of employment in her parent's store as a young woman, Gallagher never worked in the business world.

The former bank officer testified that it was his understanding that the revenues to repay the loan would come from Dr. Gallagher's dental business, and not from the debtor. Although the bank officer testified that he knew the loan was for the business and its expenses, we received no evidence or explanation as to why business profit and loss financial statements or even tax returns were not required by Calumet. The officer did testify, however, that the financial statements he did receive were those the bank required for a self-employed person.

The bank officer testified that from his experience loan applicants tended to place values higher than the actual market value on their personal assets. No independent verification, other than the credit and reference check, was conducted either at the time of the initial loan application or before the several renewals. Moreover, the Bank's counsel conceded during final argument that no independent verification was performed because it would be ridiculous to spend time or money on a $10,000.00 loan. From the face of the financial statements, we can glean that Dr. Gallagher's income rose from $38,000.00 in 1982, $42,000.00 in 1983, to $56,000.00 in 1985. Yet, no investigation was made by the bank as to how and why the financial statement values of "automobiles and other personal property" rose from $100,000.00 in 1982 and 1983 to

$250,000.00 in 1985, or "other assets" of furs, silver, gold coins, pearls & ivory, and diamonds rose from $48,000.00 in 1982 and 1983 to $87,000.00 in January of 1985.

Early on the loan was in trouble. If not from the start, Calumet certainly knew the loan was in trouble by the second renewal in early 1983. The bank officer testified that he had talked to Gallagher about their inability to reduce principal and she explained generally that the dental office had expenses, U.S. Steel layoffs reduced the dental insurance income, the children were in college, and Dr. Gallagher could not come up with the money. He also testified that he knew times were bad. When asked by the Court why the loan was renewed several times after the cash flow problems appeared, the former bank officer replied that it was the bank's policy to salvage bad cases. Again, no investigations were made by Calumet to ascertain the true condition of the assets or liabilities listed in the financial statements despite their knowledge that the Gallagher's loan was in trouble for over two (2) years before the non-renewal.

### CLAIMS OF THE PARTIES

Calumet, an unsecured creditor, contends that Gallagher, either intentionally or recklessly, caused to be published materially false financial statements, by showing: (1) assets that were either not in existence or conveniently disappeared on the day of her husband's death; (2) her net worth and overall financial condition was much better than it actually was; and (3) by only filling in the non-financial data and otherwise signing them without considering their contents.

Gallagher, with the benefit of hindsight, admits that the financial statements contain quantitative falsities, but contends that the debt to Calumet is dischargeable because: she did not cause materially false statements to be published with the requisite intent to deceive; she had no specific knowledge of and relied upon her husband

for their personal and business financial affairs; and Calumet did not reasonably rely on the financial statements when they: (1) failed to conduct an asset search or verification when the statements on their face revealed just cause to do so; (2) admitted loan applicants tended to exaggerate their personal worth; and (3) knew the loan was in trouble prior to its renewal.

### DISCUSSION

Debt discharge under the Bankruptcy Code is intended to promote the primary bankruptcy purpose of giving an honest debtor a fresh start:

> "This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt."

*Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934), citing, inter alia, *Williams v. United States Fidelity & Guaranty Co.,* 236 U.S. 549, 554–55, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915): ('relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.'). *See also, Brown v. Felsen,* 442 U.S. 127, 128, 99 S.Ct. 2205, 2207, 60 L.Ed.2d 767 (1979); H.R.Rep. No. 595, 95th Cong., 1st Sess. 125, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6086 ("The purpose of straight bankruptcy ... is to obtain a fresh start, free from creditor harassment and free from worries and pressures of too much debt."); Jackson, *The Fresh-Start Policy in Bankruptcy Law,* 98 Harv.L. Rev. 1393 (1985).[3]

---

3. The rationales for a denial of a discharge generally falls into two camps: 1) punitive-to punish the debtor for engaging in fraudulent conduct as described within § 523; or 2) protective-the innocent creditor, whom extended cred-

it in reliance on fraudulent information transmitted by the debtor, is entitled to the benefit of its bargain. Zeigler, *The Fraud Exception to Discharge in Bankruptcy: A Reappraisal,* 38 Stan.L.Rev. 891, 898–99 (1986).

"We believe the Act was meant to discharge only the *honest* debtor from his debts ... and that the Act should be liberally applied to protect the bankrupt only in those cases where there is no intent to violate its provisions."

*The Northern Trust Co. v. Garman (In the matter of Garman)*, 625 F.2d 755, 760 [*same case reprinted at* 643 F.2d 1252, 1257], (7th Cir.1980) (citations omitted, emphasis in original) *cert. denied*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981).

In keeping the balance between the fresh start policy and preventing a debtor from avoiding, through bankruptcy, the consequences of wrongful conduct, the courts have developed certain guiding principles that apply to adversary proceedings instituted by creditors seeking a nondischargeable ruling on debts.

The general rule is that all debts are dischargeable in bankruptcy unless specifically excepted by the Code. *Lake County Dept. of Public Welfare v. Marino (In re Marino)*, 29 B.R. 797, 799 (N.D.Ind. 1983) (reversing the Bankruptcy Court). Exceptions to this general rule are to be strictly construed in the debtor's favor, so as to further the effective fresh start policy of the Code. *Brown v. Felsen*, 442 U.S. 127, 128, 99 S.Ct. 2205, 2207, 60 L.Ed.2d 767 (1969), *quoting, Local Loan Co. v. Hunt, supra*, 292 U.S. at 244, 54 S.Ct. at 699 (1934). *See also, Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Matter of Cross*, 666 F.2d 873, 880 (5th Cir.1982); *In re Vickers*, 577 F.2d 683, 687 (10th Cir.1978); *Household Finance Corp. v. Danns (In re Danns)*, 558 F.2d 114, 116 (2d Cir.1977).

While the nondischargeability provision of the Bankruptcy Code, 11 U.S.C. § 523, does not expressly provide for the allocation of the burden of proof, courts have placed the responsibility of establishing that a debt is nondischargeable upon the creditor's shoulders. *Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915); *Household Finance Corp. v. Howard (In re Howard)*, 73 B.R. 694, 700 (Bankr.N.D.Ind. 1987); *First National Bank of Lansing v. Kreps (In re Kreps)*, 700 F.2d 372, 376 (7th Cir.1983); *Sears Roebuck And Co. v. Faulk (In re Faulk)*, 69 B.R. 743, 748 (Bankr.N.D.Ind. 1986).

■ The objecting party must not only affirmatively prove facts establishing that the debt is squarely within the statutory exception to discharge, *Lake County Dept. of Public Welfare v. Marino (In re Marino)*, 29 B.R. 797, 799 (N.D.Ind.1983); *Household Finance Corp. v. Danns (In re Danns)*, 558 F.2d 114, 116 (2d Cir.1977), but also prove each element by a clear and convincing standard of evidence. *Oriel v. Russell*, 278 U.S. 358, 362, 49 S.Ct. 173, 174, 73 L.Ed. 419 (1929); *In the matter of Bogstad*, 779 F.2d 370, 372 (7th Cir.1985); *First National Bank of Red Bud v. Kimzey (In re Kimzey)*, 761 F.2d 421, 423–24 (7th Cir.1985); *First Vermont Bank & Trust Co. v. Tashman (In re Tashman)*, 21 B.R. 738, 741 (Bankr.D.Vt.1982).

■ Only after the creditor establishes a *prima facie* case of fraud by meeting all of the elements of nondischargeability and has produced proof of actual knowledge of falsity or reckless disregard for the truth, *may* the burden of going forward be shifted to the debtor to rebut the logical inference of intent to deceive. *Household Finance Corp. v. Howard (In re Howard)*, 73 B.R. 694, 700, 703–04, (Bankr.N.D.Ind. 1987); *The Northern Trust Co. v. Garman (In the matter of Garman)*, 625 F.2d 755, 764 (7th Cir.1980) *cert denied*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed. 2d 333 (1981), *citing, Carini v. Matera (In re Matera)*, 592 F.2d 378, 380 (7th Cir.1979); *IFG Leasing Co. v. Vavra (In re Harms)*, 53 B.R. 134, 141 (Bankr.D. Minn.1985).

11 U.S.C. § 523(a)(2)(B), upon which Calumet relies in asserting that the scheduled indebtedness to it is nondischargeable, provides in pertinent part, that a discharge does not affect any debt as follows:

§ 523. **Exceptions to discharge.**

"(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—...

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—...

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; or...."

11 U.S.C. § 523(a)(2)(B).

In establishing a *prima facie* case for determining the dischargeability of a debt under the above quoted provision, Calumet must show that the debtor: (1) obtained money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by; (2) a statement in writing; (3) that is materially false; (4) respecting the debtor's financial condition; (5) on which the creditor reasonably relied; and (6) which the debtor caused to be made or published with intent to deceive.

In this case, there is no question that Gallagher and her late husband submitted to Calumet written financial statements, that were materially false with respect to the debtor's financial condition and obtained a $10,000.00 loan as a result.[4]

## ISSUES PRESENTED

The questions remaining for disposition under the above mentioned principles are:

(1) whether the lender actually and reasonably relied on the financial statements to advance and renew credit; and (2) whether the debtor caused the financial statements to be made or published with the requisite intent to deceive the creditor.

## RELIANCE

A creditor must prove by clear and convincing evidence both actual and reasonable reliance upon the financial statements in extending or renewing credit to the debtor. *First National Bank of Lansing v. Kreps (In re Kreps)*, 700 F.2d 372, 376 (7th Cir.1983) (a determination of no actual reliance renders moot the inquiry of reasonable reliance).

In this jurisdiction, actual reliance has been referred to as reliance in fact. *The Northern Trust Co. v. Garman (In the matter of Garman)*, 625 F.2d 755, 759 (7th Cir.1980) *cert. denied*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981). In *Garman supra*, the Seventh Circuit noted § 523(a)(2)'s predecessor, § 17(a)(2): "[D]oes not by its terms require a showing of 'reasonable reliance' and requires only a showing of reliance in fact." *Id.* 625 F.2d at 759. Reliance in fact or actual reliance is not the same as reasonable reliance:

Cases interpreting section 17(a)(2) developed two judicial glosses. First, because direct proof of actual reliance is difficult, actual reliance may be proven by circumstantial evidence of reliance. *See Matter of Garman, supra,* 625 F.2d at 759. Second, actual reliance must be reason-

---

**4.** The financial statements were in writing. *Blackwell v. Dabney (In re Blackwell)*, 702 F.2d 490, 492 (4th Cir.1983). For the purposes of § 523(a)(2)(B), the concept of publication is the same as in the tort of defamation, S.Rep. No. 95–989, 95th Cong.2d Sess. 77–79 (1978), or slander, H.R.Rep. No. 595, 95th Cong., 1st Sess. 363 (1977), *ie.* to make known to another. The financial statements as a whole were materially false, *In the Matter of Bogstad*, 779 F.2d 370, 373 (7th Cir.1985), since bank officer testified that the loan would not been made if they had known of the debtor's and her husband's true financial condition, *id.* 779 F.2d at 375, this is especially so where, as here, there existed overstatement of assets values and understatements

of material liabilities. *See, Rutland Savings Bank v. Norton (In re Norton)*, 11 B.R. 141, 144 (Bankr.D.Vt.1980); *North Park Credit v. Harmer (In re Harmer)*, 61 B.R. 1, 5 (Bankr.D.Utah 1984) (listing of representative cases defining materially false). While we have certain doubts about whether Calumet would not have lent the Galllaghers the money if they knew the true worth, especially when the bank continued to renew the original loan after being informed of the Gallaghers financial troubles and the bank's policy of salvaging bad debts, debtor has not controverted this element. Lastly, there is no dispute that the financial statements were in respect to the debtor's financial condition, albeit a joint financial condition.

able, *Carini v. Matera,* 592 F.2d 378, 381 (7th Cir.1979) (*per curiam*). In *Matter of Garman,* we discussed the meaning of "reasonable." We held that this second aspect of the section 17(a)(2) reliance test is not meant as an invitation to "second guess a creditor's decision to make a loan or to set loan policy for the creditor." 625 F.2d at 761. Further, section 17(a)(2) was not intended to empower the court to "undertake a subjective evaluation and judgment of a creditor's lending policies and practices." *Id.* at 759. *Garman* reversed the Bankruptcy Court's finding that the creditor's reliance upon net worth, rather than income, was unreasonable."

*First National Bank of Lansing v. Kreps (In re Kreps),* 700 F.2d 372, 375–76 (7th Cir.1983) (citations in original). *See also, First National Bank of Atlanta v. Robinson (In the matter of Robinson),* 55 B.R. 839, 846 (Bankr.S.D.Ind.1985) (under § 523(a)(2)(A), a plaintiff must not only prove he relied, but also that such reliance was reasonable); *IFG Leasing Co. v. Vavra (In re Harms),* 53 B.R. 134, 140 (Bankr. D.Minn.1985) (creditor's conduct is measured not only by a subjective standard of actual reliance, but also by the objective standard of reasonableness).

■ Since the uncontroverted evidence produced at trial demonstrated that the credit check was not negative, then Calumet clearly established that it placed at least partial actual reliance on the Gallaghers' financial statements for the asserted assets and net worth of more than $180,-000.00 in making the December 1982 loan of $10,000.00. Furthermore, we have already found that Calumet would not have made this loan if it had known from accurate financial statements the true condition of the Gallaghers' net worth. Thus, we find that Calumet has met the required clear and convincing standard for actual reliance. The debtor argues, however, that Calumet's reliance was unreasonable.

One of the changes in § 523(a)(2) from its predecessor § 17(a)(2), is the addition of the requirement that a creditor's reliance

be reasonable. Congress codified the reasonableness standard from case law because courts, including this Circuit, were judicially imposing this additional requirement before a finding of reliance could be made. H.R.Rep. No. 595, 95th Cong., 1st Sess. 364 (1977), *reprinted in* 1978 U.S. Code Cong. & Ad.News 5963, 6320; S.Rep. No. 989, 95th Cong., 2d Sess. 78 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5864; *First National Bank of Lansing v. Kreps (In re Kreps),* 700 F.2d 372, 376 (7th Cir.1983).

In *Household Finance Corp. v. Howard (In re Howard),* 73 B.R. 694, 705–06 (Bankr.N.D.Ind.1987) the Court compiled representative cases where courts recognized one of eight (8) categories where a creditor's reliance on a false financial statement gave rise to question reasonableness:

"1. The creditor knows from past experience or a previous financial statement that the information disclosed is not accurate, is incomplete, or inconsistent or the statement is erroneous on its face. *In re [Mutschler],* 45 B.R. 482, 493 (Bankr.D.N.Dak.1984); *In re Jackson,* 32 B.R. 549 (Bankr.E.D.Va.1983); *In re Houk,* 17 B.R. 192 (Bankr.D.S.Dak.1982) (*Creditor* had actual knowledge of adverse credit information such as judgment and lien not noted in Debtor's financial statement); *In re Klein,* 20 B.R. 119 (Bankr.E.D.Pa.1982); *In re Futterman,* 35 B.R. 102 (Bankr.D.Conn.1983).

2. The loan application itself fails to solicit adequate or sufficient information. *In re Andrews,* 33 B.R. 970, 973 (Bankr. D.Mass.1983); *In re Magnusson,* 14 B.R. 662, 668 (Bankr.N.D.N.Y.1981); *In re Isaacs,* 15 B.R. 210 (Bankr.S.D.Ohio, 1981).

3. The creditors' investigation of the statement or the debtor's background suggests the statement is false or incomplete. *In re Duncan,* 35 B.R. 323, 325 and N. 7 (Bankr.W.D.Ky.1983); *Kentile Floors v. Winham,* 440 F.2d 1128 (9th Cir.1971); *In re Smith,* 2 B.R. 276 (Bankr.E.D.Va.1980).

4. The creditor fails to make independent inquires to verify, or require the Debtor to verify the accuracy of the information on the statement. *In re Bridges,* 51 B.R. 85, 89 (Bankr.W.D.Ky. 1985); *In re Volpe,* 32 B.R. 314, 315–16 (Bankr.W.D.N.Y.1983); *In re Harms,* 53 B.R. 134, 140–41 (Bankr.D.Minn.1985) (*See,* p. 141, N.3 however. The *Harms* Court did not hold that there is imposed on the creditor a duty to make an independent verification of the financial statement regardless of whether the creditor had cause to *suspect* the information to be false or not and questioned if the Code imposes such a burden where individual or industry practice do not already require it); *In re Canon,* 43 B.R. 733, 735 (Bankr.W.D.Mo.1984). (Failure to check public records where Debtor makes representations as to state of public record). *In re Breen,* 13 B.R. 965 (Bankr.S.D.Ohio W.D.1981). *Cf. In re Garman,* 643 F.2d 1252 *supra; Matter of Bogstad,* 779 F.2d 370 *supra.*

5. The creditor does not take the usual and customary steps and procedures customary in its own lending practice or in the lending industry in verifying the information provided by the debtor. *Matter of Patch,* 24 B.R. 563, 567–68 (Bankr.D.Md.1982). *Cf., In re Garman,* 643 F.2d 1252, *supra.*

6. The financial statement is not actually considered or relied upon by the creditor in making the loan decision. *In re Jones,* 3 B.R. 410, 413 (Bankr.W.D.Va. 1980); *In re Adair,* 17 B.R. 456, 462 (Bankr.N.D.Ga.1980).

7. The lender makes the loan notwithstanding the fact that the debtor's statement has clear indicia that the debtor is not credit worthy. *Matter of Granovetter,* 29 B.R. 631, 640 (Bankr.E.D.N.Y. 1983), i.e. the creditor ignored numerous inconsistencies and suspicious circumstances or "red flags" in the application itself.

8. The creditor's loan officer tells or infers to the debtor that not all debts need be listed (e.g. only the largest or most representative). *In re Whiting,* 10 B.R. 687, 690 (Bankr.E.D.Pa.1981)."

*Household Finance Corp. v. Howard (In re Howard),* 73 B.R. 694, 705–06 (Bankr.N. D.Ind.1987) (citations in original, footnote omitted). *See also, John Deere Company v. Iverson (In re Iverson),* 66 B.R. 219, 225–226 (Bankr.D.Utah 1986) (four categories of cases where a creditor's reliance is not reasonable).

There are no per se rules for a court to determine whether a creditor's reliance is reasonable or unreasonable, instead, each § 523(a)(2)(B) exception to discharge proceeding must be examined on a case by case basis for the facts giving rise to the particular lending transaction. *First Security Bank of Fox Valley v. Ardelean (In re Ardelean),* 28 B.R. 299, 301 (Bankr.N.D. Ill.1983); *Sovran Bank N.A. v. Allen (In re Allen),* 65 B.R. 752, 763 (E.D.Va. 1986); ("[T]he inquiry does not mandate a finding of unreasonable reliance if a creditor fails to investigate certain facts about a debtor's creditworthiness"); *See In the matter of Bogstad,* 779 F.2d 370, 372–73, N.4 (7th Cir.1985) (Court decided case on issue of material falsity and did not reach the reasonableness issue; however, in *dicta,* the Court felt "uneasy" and compelled to state "a few words about the issue of 'reasonable reliance' are in order" and admonished the district court's conclusion of reasonable reliance where that court failed to examine the facts beyond looking for a " 'scarlet letter' on the breast of a loan applicant who is, basically, a stranger to the lender.").

█ In the instant proceedings, Calumet has failed to sustain its clear and convincing burden of proof of reasonable reliance when they failed to recognize the red flags signalling its call to their duty of reasonable inquiry into the circumstances surrounding the granting of the loan and its renewals.[5]

5. Since we hold that Calumet has failed to carry its burden of reasonable reliance, we need not address the issue, under 11 U.S.C. § 523 (a)(2)(B)(iv), of whether it also failed to estab-

"A creditor who ignores available information or who fails to seek information from sources that are commonly used, should not be heard to complain about the debtor's fraud. It is the creditor's failing to comport with normal business practices, not the debtor's fraud, that is the final cause of the loss."

Zaretsky, *The Fraud Exception to Discharge Under the New Bankruptcy Code*, 53 Am.Bank.L.J. 253, 262 (1979).

Calumet produced no evidence that it made any reasonable inquiry into the various assets or liabilities listed by Dr. Gallagher on the financial statements either at the time the loan was made or at the time it knew it was making the Gallagher renewals during "hard times". This is not the case where there existed an on-going business relationship which may otherwise excuse a bank from verifying a financial statement as envisioned by the Seventh Circuit in the cases of *Garman, supra*, 643 F.2d at 1257–59 or *Kreps, supra*, 700 F.2d at 376.

No elaboration, clarification, or explanation was ever requested by the bank at any time, either at the time the loan was made or even after it knew the loan was in trouble before the renewals, as to the accuracy, existence, or location of assets or liabilities.

The only evidence of verification was the bank's inquiry into Dr. Gallagher's credit rating and the checking of a reference. The bank's officer testified that had the credit rating been negative, then the loan would not have been made. With no evidence to the contrary, we found the credit check must have been positive. Simply

stated, the creditor has failed to demonstrate by clear and convincing proof that it reasonably relied on the financial statement, rather than the credit or reference checks which were neither false nor within the control of the debtor. *First Hardin National Bank & Trust v. Rosel (In re Rosel)*, 63 B.R. 603, 607 (Bankr.W.D.Ky 1986). Calumet produced no evidence that either the credit check or the reference check would lead a reasonable or prudent business person to reasonably expect he will be able to look to the debtor or the debtor's assets for satisfaction of the debt. *Signal Finance of Ohio v. Icsman (In re Icsman)*, 64 B.R. 58, 63–64 (Bankr.N.D. Ohio 1986). Calumet was surely aware that Gallagher's sole support was from her husband, and when he died and the bank subsequently refused to renew the loan, their chances, as an unsecured creditor, of getting paid died with him.

A brief, on the face, comparison of the financial statements reveals just cause for a reasonable and prudent inquiry: values of specific categories were left off the January 1985 statements; "automobiles and other personal property" increased from $100,000.00 in 1982 and 1983 to $250,000.00 by January of 1985; "other asset" increased from $48,000.00 in 1982 and 1983 to $87,000.00 in 1985; when the only source of income, Dr. Gallagher's salary from his dental practice, showed a mere increase from $38,000.00 in 1982, $42,000.00 in 1983, and $56,000.00 in 1985. Not only was the bank aware, or should have been if it had reasonably relied upon it, that the expressed purpose of the 1983 renewal was for Dr. Gallagher's business, but it never

---

lish the Debtor's reckless disregard for the truth amounting to willful misrepresentation before we may logically infer the requisite intent to deceive. *The Northern Trust Co. v. Garman (In the Matter of Garman)*, 625 F.2d 755, 764 (7th Cir.1980), *cert. denied Garman v. Northern Trust Co.*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981), *citing, Carini v. Matera (In re Matera)*, 592 F.2d 378, 380 (7th Cir.1979) *citing Houtman v. Mann (In re Houtman)*, 568 F.2d 651, 655–56 (9th Cir.1978). In *Houtman supra*, the Ninth Circuit noted the inference test was derived from *Sweet v. Ritter Finance Co.*, 263 F.Supp. 540 (W.D.Va.1967), which was a case where an illiterate bankrupt signed a statement prepared

by his wife. The court in *Sweet, supra*, held there was no evidence of recklessness in Sweet's reliance on his wife. *id.* at 544. In passing, under the facts of this proceeding, we have grave doubts that Calumet had met its burden on this issue, especially where, as here, Gallagher was ignorant of her financial environment and did not prepare the quantitative data. At best she was merely negligent for her unknowing inaccuracy and total reliance upon her husband to conduct their financial affairs. *First National Bank of Sikeston v. Masters, M.D. (In re Masters, M.D.)*, 42 B.R. 745, 747 (Bankr.E.D.Mo. 1984).

requested any financial documentation from the dental practice.

"By the same reasoning, reliance on a financial statement can be found unreasonable where a debtor has failed to fill in its line entries to an extent where it simply does not give a complete summary of his financial condition. In this case, the financial statement bristled with 'red flags' placing Plaintiff on notice that the financial statement might be incomplete or that debtors' financial condition had materially changed and further inquiry was merited; the conspicuous blanks created an obvious discontinuity with the earlier statement … Having failed to investigate the obvious discrepancies between the two statements, Plaintiff cannot be held to have *reasonably* relied on the 1982 statement."

*Nisswa State Bank v. Eberle (In re Eberle)*, 61 B.R. 638, 647–48 (Bankr.D. Minn.1985) (citations omitted, emphasis in original). *See also, W.A.F.B. Federal Credit Union v. Furimsky (In re Furimsky)*, 40 B.R. 350, 355–56 (Bankr.D.Ariz. 1984) (standard to be employed depends in part on the relative sophistication of the parties, the nature of the representation and the ease of conducting an investigation).

At the very least, the bank officer, whose responsibility it is to review loan applications and renewals, should have compared the financial statements to find these glaring inconsistencies. Had this been done, he then only had to ask the Gallaghers for an explanation or to investigate. The requirement of reasonable reliance added by the 1978 Code will not permit a creditor to: "assume the position of an ostrich with its head in the sand and ignore facts which were readily available to it." *Heinold Commodities & Securities, Inc. v. Hunt (In re Hunt)*, 30 B.R. 425, 450 (M.D.Tenn.1983) *citing, Bank of Waynesboro v. Yeiser (In re Yeiser)*, 2 B.R. 98, 101 (Bankr.M.D.Tenn.1979). Hav-

ing failed to even look at the face of the financial statements, we would be constrained to find that Calumet reasonably or, much less, actually relied on the same.

Lastly, Calumet failed to examine its own credit practices and comport its procedures to industry standards by respectively admitting that debtors tended to place higher values on their property than the market would provide and by knowingly renewing a troubled loan without inquiry.

"An emerging standard to determine whether the creditor's reliance is reasonable is to compare the creditor's own business practice and standards and customs of the industry, in light of the circumstances existing at the time the application was made and credit extended."

*First Security Bank of Fox Valley v. Ardelean (In re Ardelean)*, 28 B.R. 299, 301 (Bankr.N.D.Ill.E.D.1983); *Telco Leasing, Inc. v. Patch (In the Matter of John Henry Patch, IV.)*, 24 B.R. 563, 567 (D.C.Md. 1982); *Sovran Bank N.A. v. Allen (In re Allen)*, 65 B.R. 752, 763 (E.D.Va.1986).

In *Household Finance Corp. v. Howard (In re Howard), supra,* 73 B.R. at 707–08 the Court, mindful of the Seventh Circuit's rejection of a stringent legal standard for reasonableness in *The Northern Trust Co. v. Garman (In re Garman), supra,* 625 F.2d 755, 763, [*same case reprinted at* 643 F.2d 1252, 1260], (7th Cir. 1980), rejected a *per se* verification standard and adopted *Allen, supra,* and *Patch, supra,* and the *Ardelean, supra,* courts' rationale that:

"a departure from practice or custom *could* lead to a finding of unreasonable reliance if the following of standard practices would have provided the creditor with important information based on the circumstances existing at the time the application was made."

*Household Finance Corp. v. Howard (In re Howard), supra,* 73 B.R. at 707–08 (emphasis in text).[6]

---

**6.** The *Patch* court also stated:

"An examination of the creditor's normal business practices is important for several

We can discern no compelling reason why this same departure not only applies to the original loan transaction, but also to the subsequent renewals. Especially where, as here, Calumet not only knew from experience that loan applicants tended to place inflated values on their assets, which it failed to investigate, but also knew from the Gallaghers that times were hard and the loan was in trouble practically from the start, and yet maintained a policy of salvaging bad debts without taking any steps to protect itself in the event the loan failed.

While we do not wish to discourage policies of salvaging bad debts, a reasonably prudent creditor would have realized the inherent increased risk it had assumed by such practices and would have taken steps to protect itself beyond merely looking at the statements. In the instant case, Calumet's counsel conceded the bank's practice of not even scrutinizing, after the original loan is made, financial statements submitted with renewals. While we would ordinarily be sympathetic to practicalities, we find it patently offensive to hear Calumet attempt to justify their failure, in light of the circumstances they created, to investigate because it would be "ridiculous" to spend time or money for a $10,000.00 loan.

## CONCLUSION

The Court, having heard the evidence and weighed the same, as well as observed the witnesses and their demeanor, and giving the weight to which the Court feels the testimony is entitled, is convinced that this creditor has failed to sustain its clear and convincing burden of proof as to whether the bank reasonably relied on the statements submitted by the debtor through her husband. Calumet is asking too much of this Court when it is hard to assume such reliance where: the bank's officers failed to check the accuracy of the figures as well as the values of the stated assets and liabilities when they only had to look at the financial statements to find red flags were on the face of the financial statements; when it went no further than a mere credit or reference check at the time of the original loan application although the bank was aware that times were hard and applicants tended to exaggerate their assets; when, by their own admission, the bank maintains a policy of salvaging bad debts without so much as reviewing the financial statements submitted with renewals; when the bank maintains a policy of not investigating beyond a positive credit or reference check, because the loan was too small to warrant an investigation. In short, the bank's negligence in their own business practices and not following the standards and customs of the industry, in light of the circumstances of this loan and its renewals, compels this Court to deny Calumet from having the debt excepted from the discharge of the Debtor for lack of reasonable reliance. 11 U.S.C. § 523 (a)(2)(B)(iii). Accordingly,

We ORDER that Adversary Proceeding No. 85–6085, *Calumet National Bank v. Lee Gallagher*, is hereby DISMISSED, and FURTHER ORDER that the clerk of the Bankruptcy Court enter Judgment for the debtor, Lee O. Gallagher, and against the plaintiff, Calumet National Bank.

reasons. For example, the creditor's failure to follow its own practices may be evidence of unreasonable conduct. Further, evidence of a creditor's normal practices would shed light on the character of its operation and allow for a comparison with industry standards. The customs and practices of the industry should be examined because commercial lending practices are not static. As economic and social changes occur, the industry can be expected to act in a manner that will protect the financial integrity of its operations. As the false statement exception to discharge is of national application, the peculiar practices of a particular creditor can not be the sole benchmark for assessing the reasonableness of its reliance. In other words, a creditor cannot disregard industry custom and be held to have acted reasonably, if the following of standard practices would have provided the creditor with important information."
*Telco Leasing, Inc. v. Patch IV. (In the matter of Patch IV.),* 24 B.R. 563, 567–68 (D.Md.1982).