In re Joyce Jean COMPTON, Debtor.

**STANDARD FEDERAL
BANK, Plaintiff,**

v.

**Joyce Jean COMPTON, Defendant.**

**Bankruptcy No. 87–10480 HCD.
Adv. No. 87–1076.**

United States Bankruptcy Court,
N.D. Indiana,
Fort Wayne Division.

March 28, 1989.

Wesley Steury, Ft. Wayne, Ind., for plaintiff.

Kirby G. Moss, Ft. Wayne, Ind., for defendant.

## ORDER

HARRY C. DEES, Jr., Bankruptcy Judge.

. This case is before the court on a COMPLAINT TO DETERMINE DISCHARGEABILITY filed on July 16, 1987, by Standard Federal Bank ("Bank") against Joyce Jean Compton, Debtor/Defendant herein ("Defendant"), under 11 U.S.C. § 523(a)(2)(A) and (B), and (a)(6).

After various continuances and efforts at discovery, a trial was held in Fort Wayne on September 22, 1988. The court directed counsel for each party to submit proposed findings of fact and conclusions of law. Both parties did so on October 7, 1988. The Defendant filed responses and objections on October 17, 1988 and the Bank filed supplementary findings of fact and conclusions of law on October 14, 1988, which were objected to by the Defendant on October 21, 1988, and which the Defendant seeks to have stricken as being unsupported by the evidence. The court disagrees with the Defendant's contention and DENIES the request to strike.

For the reasons set out below, the court GRANTS the Bank's request for relief and finds the debt NONDISCHARGEABLE.

## Jurisdiction

While the parties by their complaint and answer do not admit or deny the court's jurisdiction over this matter, the court finds that the matter before it concerns a complaint to determine the dischargeability of a debt and as such is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I). The court has jurisdiction over the matter pursuant to 28 U.S.C. § 157(a) and General Rule 45 of the Rules of the United States District Court for the Northern District of Indiana, and the case has been referred to the undersigned Bankruptcy Judge for hearing and determination.

The court having reviewed the record now makes the following entry. This entry shall serve as findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52 made applicable to bankruptcy proceedings by Bankruptcy Rules 7052 and 9014.

## Issue

Tragedy, as the ancient Greeks saw it, involves the descent of a decent individual into an inevitable conflict with a superior force, such as fate, fortune, or unrequited love, *etc.*, reaching a calamitous conclusion which creates sympathy and pity in the observer. The Defendant in this case had fallen hopelessly in love with a conniving operator, one John Zintsmaster ("Zintsmaster"), who manipulated and used her, finally leaving her bankrupt not only financially, but emotionally as well. Tragic as her descent may have been, did she enter into it with her eyes open? Did she, in other words, obtain "... money or property ... by false pretenses, a false representation, or actual fraud ...," or by the use of a materially false financial statement, with the requisite intent to deceive that would render the debt based on this conduct nondischargeable, or did she cause "... willful and malicious injury ... to the property of another entity" by converting the car or the proceeds of the loan from the Bank?

## Factual Background

The Defendant filed a voluntary petition under chapter 7 of the Bankruptcy Code on April 15, 1987. The Defendant is employed as a quality control foreman at Kitco, Inc.,

in Bluffton, Indiana, where she has been working for twenty-six (26) years. Her husband died suddenly of a heart attack in 1977. She met Zintsmaster in 1980 and began to see him off and on during 1982. She became romantically involved with Zintsmaster sometime in 1984.

In early 1985, the Defendant and Zintsmaster established a business selling cars. The Defendant, at Zintsmaster's direction, completed the necessary application for the issuance of a wholesale dealer's plate from the State of Indiana sometime between March and May. The Defendant and Zintsmaster created the business under the name of J's Enterprises, d/b/a Car Supply. A short time later a wholesale dealer's license plate was issued by the State of Indiana to the Defendant. The Defendant opened a business account with Farmers & Merchants Bank, Bluffton, Indiana ("Farmers"), on April 8, 1985 with herself and John Zintsmaster as signatories on the account. The name on the account was:

Car Supply
J's Enterprises DBA
1316 West Cherry
Bluffton, IN 46714

The address of the business was the same as the Defendant's home address.

The Defendant testified that she had no personal involvement in the management or control of the business or the acquisition of the cars. She stated that Zintsmaster was in complete control of the business and that she just signed checks when he told her to and allowed the business to use her name and home address. The Defendant stated that Car Supply was issued two sets of wholesale dealer's license plates, one for 1985 and one for 1986. According to the Defendant's recollection, the business ceased operations sometime near the end of 1986. The Defendant admitted that while the bank statements were delivered to her home, she only saw one or two of the them. She further explained that she had no knowledge of any of the underlying transactions evidenced by the checks and deposits set out on the bank statements.

She testified that when she did question Zintsmaster as to the details surrounding Car Supply's business dealings, he was always evasive and often stated he would "... talk to her later about it." The Defendant admitted that she attended a few car auctions with Zintsmaster where he sold but did not purchase cars, but was unable to state how many cars were involved in the Car Supply business over its two year life. The Defendant testified that she was in love with Zintsmaster and did whatever he told her to do. She explained that while she had no experience in the car business, Zintsmaster did, and the business "... was something we would have together."

From the Defendant's testimony, it was apparent that the Defendant made attempts to question Zintsmaster concerning the business but never pursued those matters after being put off by Zintsmaster's evasive answers.

Sometime before December of 1985, the Defendant accompanied Zintsmaster to Florida to pick up a 1984 Corvette. While driving back from Florida in the Corvette, Zintsmaster convinced the Defendant to apply for a loan to purchase the Corvette. She testified in the deposition[1] that the Corvette was purchased for resale by Car Suppliers.[2] She admitted that she had no proof but believed that "... Zintsmaster was Car Suppliers." The Defendant successfully obtained a loan in her own name and not on behalf of the business, Car

1. Plaintiff's Exhibit 8.

2. Car Suppliers is another business, separate and apart from Car Supply, in which the Defendant had no interest, but coincidentally shares a similar name with the Defendant's business, Car Supply.

Supply, for the purchase of the Corvette in the amount of $18,000.00 from the Old First National Bank in Bluffton, Indiana ("Old First"). She explained that she received the loan proceeds and gave Old First a security interest in the Corvette, and that soon thereafter Zintsmaster "resold" the car. She admitted that she never saw the sale proceeds and that Zintsmaster did not pay off her loan at Old First. She testified that when she asked him why he had failed to pay off Old First, he informed her that "... he was having financial problems." The Defendant admitted that Old First's lien was never recorded on the title and in fact she had never seen the title to the Corvette. When asked by counsel for the Plaintiff what had happened to the Corvette, the Defendant explained that Zintsmaster told her "... it went back to Florida." The Defendant did not pursue the matter further with Zintsmaster. The Defendant attempted to explain this conduct by stating that Zintsmaster was a very persuasive man and that she loved him. The Defendant stated that when she defaulted on the Old First loan the balance was about $15,000.00. This entire scenario was prior to December of 1985.

The Defendant next admitted that she obtained a loan in the amount of $7,149.00 from Farmers for the purchase of a Pontiac. The Defendant stated that she signed a personal ninety-day note and gave Farmers a security interest in the car. She admitted that she understood that Farmers' lien was to have been noted on the title. She explained that Zintsmaster had obtained the car for her and at some point he had her "sign off" on the title. The Defendant stated that because the car was never plated, Farmers' lien was never noted on the title and the car was then "resold" by Zintsmaster. The Defendant did not see the car after she "signed off" on the title. The Defendant also defaulted on this loan. The Defendant acknowledged that the proceeds of the sale were not used to pay off the note to Farmers and she was

unaware of what Zintsmaster did with the proceeds of the Farmers' loan or of the sale proceeds of the Pontiac. She stated that "... she did not know that Zintsmaster could sell the car without paying off Farmers because the lien was not noted on the title." Again, this transaction transpired sometime just prior to December of 1985.

December 20, 1985: Enter Standard Federal Bank of Bluffton, Indiana, Stage Left. The Defendant stated that Zintsmaster had proposed marriage to her and that they had decided they would need a personal car for the Defendant to drive. Zintsmaster bought her a loaded 1986 Camaro Z–28 about the middle of December 1985. On December 20, 1985, the Defendant went to the Bluffton branch of the Bank, alone, and completed a Consumer Loan Application [3] ("Loan Application") wherein she sought to borrow $14,500.00 for the purchase of the Camaro. The Defendant stated that Zintsmaster next brought her the Retail Order for a Motor Vehicle [4] ("Retail Order") dated December 26, 1985, which set out the details for the transaction including a $2,051.00 trade-in allowance for her 1978 Mercury. The Retail Order set out the following facts and figures:

| | |
|---|---|
| TO: Car Suppliers | Purchaser: Joyce J. Compton |
| 5365 W. 86th St. | 1316 W. Cherry St. |
| Indianapolis, IN | Bluffton, IN |

Salesman: Robert McQuin

| | |
|---|---|
| Cash Sales Price of Described Motor Vehicle | $18,651.00 |
| Sales Tax | 830.00 |
| Total Price of Unit | $19,481.00 |

---

**3.** Plaintiff's Exhibit 2.

**4.** Plaintiff's Exhibit 1.

| | |
|---|---|
| Down Payment: Cash | $ (2,930.00) |
| Net Trade-in | (2,051.00) |
| Unpaid Cash Balance | $14,500.00 |

Under the section of the Loan Application entitled "List Creditors (Bank/Credit Cards, Loans, *etc.*)" the Defendant listed the following creditors: "J.C. Penneys, Phillip Petroleum, Sears, Montgomery Ward, Marathon Oil." Glaringly absent from this list are the loans from Old First for the Corvette and from Farmers for the Pontiac. After the Defendant defaulted, the loan balance of those accounts was in excess of $22,000.00. The Defendant admitted that she omitted the car loan debts to Old First and to Farmers from her Loan Application with the Bank. She stated that she did not know why she omitted that information but stated that she did not intend to omit that information from the Loan Application to mislead the Bank.

The Defendant acknowledged that she understood she was giving the Bank a security interest in the Camaro in return for the loan and she admitted that she knew the Bank's lien would have to be noted on the title.

The Bank admitted into evidence the bank statements [5] of Car Supply for January of 1986. The Bank issued a check [6] to Joyce Compton and Car Suppliers on December 30, 1985, in the amount of $14,500.00, and coincidentally a deposit was made into the account of Car Supply at Farmers, on January 2, 1986, in the amount of $14,500.00. The Defendant stated that she was unaware of the deposit and was unsure if the origin of the deposit was the $14,500.00 check issued by the Bank.

Again, she reiterated that she was not privy to the business accounts and transactions of Car Supply even though the dealer's license plates were issued to her, the bank account was in her name, and the address of the business was her home. She stated that her only involvement was to occasionally write checks when instructed to do so by Zintsmaster. He never explained why or the purpose of the checks and she blindly followed his direction.

Elizabeth Sell, a Bank employee for fifteen (15) years and the branch manager at Bluffton, was involved in the loan transaction for the Camaro with the Defendant. She testified that she was unable to remember [7] if she specifically asked the Defendant to list all of her debts. She testified that it was her usual and customary practice to ask every loan applicant to specifically list each and every debt in order for the Bank to make an informed judgment as to whether the loan should be granted. She stated that she had no reason to believe that she departed from this practice during the loan transaction at issue. Ms. Sell stated that she felt sure she did instruct the Defendant to list all debts because she found an entry on the Loan Application that was in her own handwriting which convinced her that she must have gone over all other entries on the Loan Application with the Defendant.

Shirley Helmke, the loan officer in the Fort Wayne branch of the Bank who was involved in this transaction in December of 1985 explained how the loan department reviews proposed loan applications. The review, she testified, depends on such factors as credit history, time on the job, and debt ratio. The loan officers rely on the Loan Application and the Fort Wayne Credit Bureau ("FWCB") report.[8] She testified that the Defendant's loans from Old First and from Farmers were not listed on

---

5. Plaintiff's Exhibit 6.

6. Plaintiff's Exhibit 4.

7. The Loan Application was completed on December 20, 1985, and the trial on the issue was held on September 22, 1988, nearly three years later and long after memories of generic loan transactions begin to fade.

8. Plaintiff's Exhibit 9.

the Loan Application or on the FWCB report and if that information had been available to her she would not have recommended that the loan be made because the debt ratio would have been too high.

When questioned why the Bank had not checked with outlying area credit bureaus such as those that represented the Bluffton area, Ms. Helmke testified that the Bank had ceased doing business with those credit bureaus around 1983 because the information they had received was not accurate and up to date. She stated that although all the banks were required to report debt information they sometimes failed to comply. During December of 1985, she admitted that the reporting practices of the banks in the surrounding areas to the FWCB was not very good, but has since been improving.

After review of and in reliance upon the Defendant's Loan Application and the FWCB report, Ms. Helmke recommended to the loan board that the loan for the Camaro be approved.

On December 30, 1985, the Defendant and the Bank closed the loan and the Bank issued a check for the loan proceeds made out to "Joyce Compton and Car Suppliers" in the amount of $14,500.00.

The Defendant was next questioned about her relationship with Mr. McQuin and her knowledge of the nexus between Car Suppliers and Zintsmaster. The Defendant stated that she never met Mr. McQuin, the Car Suppliers "salesman," but spoke to him on the phone prior to the purchase of the Camaro "... just about the car, you know, just little things." The Defendant acknowledged endorsing the Bank's loan proceeds check but was unaware if Mr. McQuin also endorsed the check. She admitted giving the check to Zintsmaster and not knowing what he did with it. Again, the Defendant admitted

that she believed Zintsmaster was a part of Car Suppliers and as such could have cashed the Bank's loan check she had already endorsed, and yet she still turned the $14,500.00 check over to him.

The Defendant acknowledged that the Retail Order reflected the trade-in of her 1978 Mercury, but in fact at the time of the trial she still had the Mercury in her possession. She explained that she did not turn over the title to the Mercury to Zintsmaster when she bought the Camaro because he did not ask her for it and the car was not even running at the time.

The Defendant stated that she had the Camaro for several weeks when it developed a "ping" noise and ran roughly. She asked Zintsmaster about the problem and he told her that the car should be returned to the dealer for an inspection of the problem. He then instructed her to drive the Camaro to the Castleton Square Shopping Mall on the Northeast side of Indianapolis, Indiana, and to leave the car in the parking lot with the keys on top of the rear tire. When questioned about the soundness of leaving a new and expensive car in a mall parking lot with the keys on top of the rear tire, she explained that she had been with Zintsmaster when he had done this before and she suggested this was a simple "standard operating procedure for the business." She testified that she assumed McQuin would pick up the car, repair the problem, and return the car to her.

At this point, more than two months after delivery, the Defendant had still not received the title to the Camaro. When she questioned Zintsmaster about the title he told her "... it was still in Ohio" and "... it would just take time to get it." She continued to pursue Zintsmaster for the title and for the return of the car but she said that he always had some excuse. She stated that Zintsmaster told her that "... things had happened, he'd talk to me later." She admitted that she finally began

to believe she would never again see the car, let alone the title. She stated that she continued to make payments on the Camaro for a period of time even after she no longer had physical possession of the car.

She admitted that during this time the Bank had been calling her about the title and that she misled them into believing that she would be getting the title, even though she knew she never would.

The Defendant admitted that she knew she was violating the security agreements with Old First, Farmers, and the Bank when the cars were sold. She attempted to explain her acquiescence in the sales by stating it was because she "... believed in and loved Zintsmaster." She admitted that Zintsmaster conned her and that because she loved him, she "... would have done anything for him." She stated that Zintsmaster never threatened her or used force against her, and admitted that she freely turned over to Zintsmaster the proceeds of the loans she took out on the Corvette, the Pontiac, and the Camaro. She also allowed him to remove the cars from her possession. He never returned the cars, explained their disappearance, or paid off any of the loans the Defendant took out to finance the purchase of the cars. The Defendant also complained that Zintsmaster used her credit cards and ran up enormous bills which he never paid. She bemoaned the way he treated her yet she still believed that he was going to marry her. Armed with the facts that:

1) the Corvette and Pontiac had previously "disappeared" at the hands of Zintsmaster without explanation;
2) the debts to Old First and Farmers that Zintsmaster convinced her to incur remained unpaid even though the cars had been disposed of by Z; and,
3) even without proof, she still suspected that Zintsmaster was tied in with Car Suppliers who was the dealer/seller of the Camaro;

she nevertheless turned over to Zintsmaster the $14,500.00 loan proceeds check from the Bank and, a short time later, the Camaro.

### Discussion

The Bank seeks to have the Defendant's debt held nondischargeable under a variety of theories, all emanating from 11 U.S.C. § 523(a). The first theory is based on § 523(a)(2)(A) which states in pertinent part:

**11 U.S.C. § 523. Exceptions to discharge.**

(a) A discharge under section 727, 1141, 1228[a] 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

The second theory relies on § 523(a)(2)(B) whereby the Bank alleges that the Defendant intentionally deceived the Bank into loaning her money based on her Loan Application from which the Defendant omitted in excess of $22,000.00 of debt. The third theory which the Bank contends would render the debt nondischargeable is:

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6).

The court will first address the Bank's second theory based on § 523(a)(2)(B). The elements that the Bank must prove to support its claim are "1) the Defendant obtained money, property, services or credit, 2) by a financial statement, 3) in writing, 4) concerning the Defendant's or an insider's financial condition, 5) that the financial statement was materially false, 6) that the

Defendant caused it to be published with the intent to deceive the creditors, 7) that the creditor relied on it, 8) that such reliance was reasonable, and 9) that the creditor's loss was the proximate result of the publication of the financial statement." *Mortgage Guaranty Insurance Corp. v. Pascucci (In re Pascucci)*, 90 B.R. 438, 446 (Bankr.C.D.Cal.1988); *Calumet National Bank v. Gallagher (In re Gallagher)*, 72 B.R. 830, 834–35 (Bankr.N.D.Ind.1987);

The Bank, as the objecting and moving party, must establish a *prima facie* case that the debt fits within the statutory exception to discharge, *Id; Lake County Dept. of Public Welfare v. Marino (In re Marino)*, 29 B.R. 797, 799 (D.Ind.1983), and the Bank must make this showing by a standard of clear and convincing evidence. *First National Bank of Red Bud v. Kimzey (In re Kimzey)*, 761 F.2d 421, 423–24 (7th Cir.1985); *Marino*, 72 B.R. at 834; *Pascucci*, 90 B.R. at 444. In light of the strong policy of the Bankruptcy Code to provide the debtor with a fresh start, the exceptions to discharge are generally construed liberally in favor of the debtor and strictly against the creditor. *Hossinger v. Tackett (In re Tackett)*, 66 B.R. 77, 79 (Bankr.N.D.Ind.1986); *Federal Deposit Insurance Corporation v. Cerar (In re Cerar)*, 84 B.R. 524, 526 (Bankr.C.D.Ill.1988), *aff'd*, 97 B.R. 447 (C.D.Ill.1989).

■ Once the Bank has proven its *prima facie* case by producing proof of actual knowledge of falsity or reckless disregard for the truth, then the burden of going forward will be shifted to the Defendant to rebut the logical inference of intent to deceive. *Household Finance Corp. v. Howard (In re Howard)*, 73 B.R. 694, 700 (Bankr.N.D.Ind.1987); *The Northern Trust Co. v. Garman (In re Garman)*, 625 F.2d 755, 764 (7th Cir.1980), *republished in, The Northern Trust Company v. Garman (In re Garman)*, 643 F.2d 1252 (7th Cir.1980),

*cert. denied sub nom., Garman v. The Northern Trust Company*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981), (citing, *Carini v. Matera (In re Matera)*, 592 F.2d 378, 380 (7th Cir.1979) superseded by statute/rule as stated in *Jahanger v. Bedard (In re Bedard)*, 19 B.R. 565 (Bankr.E.D.Pa.1982)); *Gallagher*, 72 B.R. at 834.

In this case the court finds that the Defendant obtained money from the Bank [9] by a written financial statement concerning her financial condition [10] that was materially false in that it omitted in excess of $22,000.00 of debt owed by the Defendant. The basic magnitude of the discrepancy in debts existing and in debts listed by the Defendant on her Loan Application was great enough to render the Loan Application materially false. *Burke and Herbert Bank and Trust Company v. Crockett (In re Crockett)*, 11 B.R. 822, 827 (Bankr.E.D.Va.1981). The only issues left to resolve are whether the Defendant published the false financial statement with intent to deceive and whether the Bank reasonably relied on the statement. If both of these issues are resolved in favor of the Bank then the remaining issue of loss as the proximate result of publication, would automatically be resolved in favor of the Bank.

Ms. Helmke, the loan officer for the Bank, testified that the Bank relied on the Loan Application as well as the FWCB report in order to determine if the loan for the Camaro should be approved. She also testified that had she been aware of the Defendant's true financial situation, wherein the Defendant had defaulted on two outstanding debts obtained for the purchase of expensive automobiles, she would not have recommended to the board that the loan be approved. This testimony was uncontroverted. Evidence to show that the loan would not have been granted if the lender had received accurate information is sufficient to show actual reliance. *In re*

---

**9.** *See,* Plaintiff's Exhibit 4.

**10.** *See,* Plaintiff's Exhibit 2.

*Coughlin*, 27 B.R. 632, 637 (Bankr. 1st Cir.1983). The court finds that the Bank relied on the Defendant's false financial statement.

However, actual reliance or reliance in fact is a separate issue from a finding of "reasonable reliance." In the *Howard* case, Judge Lindquist set out a list of the most common scenarios in which courts have found a lack of "reasonable reliance." Those instances include:

1. The creditor knows from past experience or a previous financial statement that the information disclosed is not accurate, is incomplete, or inconsistent or the statement is erroneous on its face. *In re Mutschuler*, 45 B.R. 482, 493 (Bankr.D.N.Dak.1984); *In re Jackson*, 32 B.R. 549 (Bankr.E.D.Pa.1983); *In re Houk*, 17 B.R. 192 (Bankr.D.S.Dak.1982) (Debtor had actual knowledge of adverse credit information such as judgment and lien not noted in Debtor's financial statement); *In re Klein*, 20 B.R. 119 (Bankr. E.D.Pa.1982); *In re Futterman*, 35 B.R. 102 (Bankr.D.Conn.1983).

2. The loan application itself fails to solicit adequate or sufficient information. *In re Andrews*, 33 B.R. 970, 973 (Bankr. D.Mass.1983); *In re Magnusson*, 14 B.R. 662, 668 (Bankr.N.D.N.Y.1981); *In re Issacs*, 15 B.R. 210 (Bankr.S.D.Ohio 1981).

3. The creditors' investigation of the statement or the Debtor's background suggests the statement is false or incomplete. *In re Duncan*, 35 B.R. 323, 325 and n. 7 (Bankr.W.D.Ky.1983); *Kentile Floors v. Winham*, 440 F.2d 1128 (9th Cir.1971); *In re Smith*, 2 B.R. 276 (Bankr.E.D.Va.1980).

4. The creditor fails to make independent inquiries to verify, or require the Debtor to verify the accuracy of the information on the statement. *In re Bridges*, 51 B.R. 85, 89 (Bankr.W.D.Ky. 1985); *In re Vople*, 32 B.R. 314, 315–316

(Bankr.W.D.N.Y.1983); *In re Harms*, 53 B.R. 134, 140–141 (Bankr.D.Minn.1985) (*See*, p. 141, n. 3 however. The *Harms* court did not hold that there is imposed on the creditor a duty to make an independent verification of the financial statement regardless of whether the creditor had cause to subject the information to be false or not and questioned if the Code imposes such a burden where individual or industry practice to no already require it); *In re Canon*, 43 B.R. 733, 735 (Bankr.W.D.Mo.1984). (Failure to check public records where Debtor makes representation as to state of public record). *In re Breen*, 13 B.R. 965 (Bankr.S.D.Ohio W.D.1981). *Cf.*, *In re Garman*, 643 F.2d 1252 *supra; Matter of Bogstad*, 779 F.2d 370 [ (7th Cir.1985) ] *supra.*

5. The creditor does not take the usual and customary steps and procedures customary in its own lending practice or in the lending industry in verifying the information provided by the debtor. *Matter of Patch*, 24 B.R. 563, 567–568 (Bankr.D.Md.1982). *Cf. In re Garman*, 643 F.2d 1252, *supra.*

6. The financial statement is not actually considered or relied upon by the creditor in making the loan decision. *In re Jones*, 3 B.R. 410, 413 (Bankr.W.D.Va. 1980); *In re Adair*, 17 B.R. 456, 462 (Bankr.N.D.Ga.1980).

7. The lender makes the loan notwithstanding the fact that the debtor's statement was clear indicia that the debtor is not credit worthy. *Matter of Granovetter*, 29 B.R. 631, 640 (Bankr.E.D.N.Y. 1983), *i.e.*, the creditor ignored numerous inconsistencies and suspicious circumstances or "red flags" in the application itself.

8. The creditor's loan officer tells or infers to the debtor that not all debts need be listed (*e.g.*, only the largest or most representative). *In re Whiting*, 10 B.R. 687, 690 (Bankr.E.D.Pa.1981).

*Howard,* 73 B.R. at 705–06 (Citations in original; footnote omitted.)

■ Although the Bankruptcy Code requires the creditor to reasonably rely on the false financial statement in order to support a finding of nondischargeability of the underlying debt, the 7th Circuit has established a liberal standard of reasonableness. *Garman,* 643 F.2d at 1259–60. The emerging standard to determine whether the creditor's reliance was reasonable is to "... compare the creditor's actual conduct to the creditor's own business practice and standards and customs of the industry, in light of the surrounding circumstances." *First Security Bank of Fox Valley v. Ardelean (In re Ardelean),* 28 B.R. 299, 301 (Bankr.N.D.Ill.1983); *Howard,* 73 B.R. at 707; *Pascucci,* 90 B.R. at 446.

In discussing reasonableness, the 7th Circuit has stated that "[A]lthough the court should protect lenders from unscrupulous debtors, it is not our business to bail out any lender no matter how reckless it gives out its money." *In re Bogstad,* 779 F.2d 370, 372–73 n. 4 (7th Cir.1985). The words of wisdom set out by a frequently quoted commentator sum up the issue succinctly:

A creditor who ignores available information or who fails to seek information from sources that are commonly used, should not be heard to complain about the debtors' fraud. It is the creditor's failing to comport with normal business practices, not the debtor's fraud, that is the final cause of the loss.

Zaretsky, *The Fraud Exception to Discharge Under the New Bankruptcy Code,* 53 Am.Bank.L.J. 253, 262 (1979).

■ Ms. Helmke testified that it was the customary business practice of the Bank to utilize only the FWCB reports. She explained that the Bank had ceased to rely on the credit bureau reports from the small surrounding communities in 1983 because of inaccuracies and a lack of updated information. While a check of those credit bureaus may have shown that the Defendant had unlisted outstanding debts with Old First and Farmers, Ms. Helmke testified that there was no guarantee that Old First and Farmers had reported that debt information to the credit bureaus. She stated that the banks were required to report, but often did not comply with this requirement. Therefore, the court finds that the Bank followed its customary business practice of relying on the FWCB report as well as the information listed by the Defendant on her Loan Application before approving the loan, and that there were no facts to put the Bank on notice that the information on the Loan Application was inaccurate. The court further finds that the Bank's reliance was reasonable.

■ The final issue is whether the Defendant intended to deceive the Bank into approving her Loan Application by omitting outstanding debts. Intent to deceive is an ethereal concept and at best, difficult to prove. Often the court must look to the circumstances surrounding a transaction and infer intent to deceive from the conduct of the Defendant. *Crockett,* 11 B.R. at 827.

The Defendant is unable to explain the reason for the omission of over $22,000.00 in loan debt incurred by the Defendant for the purchase of cars within a short time before her Loan Application with the Bank for an additional $14,500.00 for a third car. Given the Defendant's job history and supervisory job level, it is obvious to this court that the Defendant was sophisticated enough in business practices to understand that the section entitled "List All Creditors" on the Loan Application meant to list *all* persons or entities to whom she owed money. *W.A.F.B. Federal Credit Union v. Furmisky (In re Furmisky),* 40 B.R. 350, 355 (Bankr.D.Ariz.1984). The court is convinced that the Defendant realized that if she listed the debts to Old First and to

Farmers then she surely would have been denied the loan for the Camaro. Zintsmaster's promise of marriage and their "need for a personal car" was enough to actuate her desire to do anything for Zintsmaster including misrepresenting her financial condition on the Loan Application to insure that she would get the loan for the Camaro.

Zintsmaster used the Defendant as a vehicle to perpetrate his fraud. The court finds that the Defendant's debt to Old First and perhaps even the debt to Farmers may have been found dischargeable because the Defendant lacked the requisite knowledge and intent in these early transactions. However, the court is unable and unwilling to extend its trust of the Defendant's character to cover a third loan when the Defendant knew or should have known that the same thing would probably happen again. The facts as set out above leave the court no other recourse but to believe that the Defendant was on notice that the Camaro would also "disappear" at the hands of Zintsmaster if she were to turn over the $14,500.00 loan proceeds to him.

In addition, the Defendant expressed to the court her suspicion that before the purchase of the Camaro from Car Suppliers, Zintsmaster was somehow involved with Car Suppliers. Even with the knowledge that she was saddled with the debts to Old First and to Farmers in excess of $22,-000.00, and numerous bank credit card companies, she went ahead and applied for a third car loan in the amount of $14,500.00 and omitted her liabilities to Old First and to Farmers, apparently hoping against hope, that the Camaro would not also "disappear."

It strains the court's credulity to believe the Defendant's love-starved and tearful explanation for her conduct. The old adage that "the third time is a charm" is not applicable on these facts. As they say in baseball, three strikes and you're out. The court is not swayed by the Defendant's tearful exhortations. The Defendant's conduct bears a harsh resemblance to that of F. Scott Fitzgerald's character Daisy in *The Great Gatsby*. The difference however, is that Daisy's seemingly endless wealth could support her financial follies with the men and opportunities in her life. The Defendant did not have the same riches and affluence at her disposal.

While the court may be moved by the anguish and heartbreak described by Shakespeare and his contemporaries, the Defendant's circumstances were self-imposed nearly four centuries after feudal and medieval times provided a backdrop which cried for the writing of the great tragedies.

Therefore, the court finds that the Defendant published the false financial statement with intent to deceive the Bank.

### Conclusion

Accordingly, the court finds that the Defendant obtained a loan from the Bank in the amount of $14,500.00 by materially misrepresenting her debts by more than $22,-000.00 in a written statement on which the Bank reasonably relied, with intent to deceive the Bank whereby the Bank suffered a loss when the Defendant defaulted on the loan that was the proximate result of the publication of the financial statement. Because the Bank has prevailed under 11 U.S.C. § 523(a)(2)(B), discussion of its alternate theories of recovery under § 523(a)(2)(A) and (a)(6) is unnecessary.

SO ORDERED.