149 B.R. 802 (1993)
In re: Thomas W. O'CONNOR, Jr., Debtor.
I.H. MISSISSIPPI VALLEY CREDIT UNION, Plaintiff,
v.
Thomas W. O'CONNOR, Jr., Defendant.
Bankruptcy No. 91-32380-S, Adv. No. 91-3118.
United States Bankruptcy Court, E.D. Virginia, Richmond Division.
January 6, 1993.
*803 J.J. O'Connell, III, Richmond, VA, for plaintiff.
W.L. Hooker, Richmond, VA, for defendant.

MEMORANDUM OPINION
BLACKWELL N. SHELLEY, Bankruptcy Judge.
This matter comes before the Court upon the second amended complaint of I.H. Mississippi Valley Credit Union ("IHMV"), filed March 12, 1992, to determine dischargeability of debt under 11 U.S.C. § 523(a). This Court held a trial on the adversary proceeding on October 8, 1992. Upon considering the evidence presented and the arguments of counsel, this Court makes the following findings of fact and conclusions of law.

FINDINGS OF FACT
Thomas W. O'Connor ("O'Connor" or "debtor") was involved with Michael Sher ("Sher"), owner of City Wide Auto Mart ("City Wide"), in a venture to buy and sell "gray market" Mercedes Benz automobiles. O'Connor borrowed money from credit unions to purchase Mercedes Benz automobiles that Sher would buy in Germany and then bring to the United States. Sher would refit the automobile with the necessary safety equipment to pass U.S. inspection, and then sell it for a profit. Sher would then pay off the credit union loan and split the profit with O'Connor. O'Connor hoped to turn over a sufficient number of cars to enable him to actually afford a Mercedes Benz for himself.
The debtor took out a total of four car loans, each in the amount of about $20,000, *804 at different times during the ten months between October 1986 and August 1987. The debtor turned the proceeds of the loans over to Sher for the purchase of four "grey market" Mercedes Benz automobiles. The plaintiff, IHMV Credit Union, through its loan officer, Pat Bert, made three of the four loans. The debtor dealt solely with Bert at IHMV, with whom he had a known customer relationship dating back to September 1984.
The first two transactions, occurring in August 1986 and May 1987, concluded successfully. With the proceeds from the sales of the two cars, Mr. Sher paid IHMV the principal and interest on the loans before the first payments were due, and O'Connor received his share of the profits. The third transaction involving IHMV, entered into on August 4, 1987, is the subject of its complaint to determine the debt non-dischargeable under 11 U.S.C. § 523(a).
On July 2, 1987, between the settlement of the second and the taking out of the last IHMV loan, O'Connor borrowed $22,000 from the Airline Pilots Association Federal Credit Union ("ALPA") to purchase a 1983 Mercedes Benz automobile from City Wide. The first payment on the ALPA loan was due on August 2, 1987. Just prior to that due date O'Connor learned that Sher was having problems selling the 1983 Mercedes. Not knowing for sure whether Sher had paid off the ALPA loan, but suspecting that he had not, O'Connor made the first monthly car loan payment on the "grey market" Mercedes by check dated August 1, 1987, in the amount of $489.38. When confronted by Connor several days later Sher promised to pay off the ALPA loan by August 15, 1987.
Also on August 1, 1987, the debtor called IHMV Credit Union and spoke to Patricia Bert, the loan officer at IHMV. Bert took application over the phone for a loan to purchase a 1984 Mercedes Benz automobile. During the conversation, Bert wrote down information on a loan request form for use in the loan application process. See Plaintiff's Exhibit 5. Significantly, the IHMV form does not include information concerning the outstanding ALPA loan. Based on this omission, the plaintiff alleges that this loan agreement is a false financial statement.
Also significantly, Bert listed the debtor's occupation as an airline pilot with a major regional airline at a gross salary of $68,000. The only monthly loan payments Bert listed on the application were a $130 payment on an unsecured credit card balance of $2,600, and a $252 payment on a partially secured $4,800 IHMV consolidation loan debt. Bert listed O'Connor's other monthly liabilities as $675 for child support and $200 for rent.
The credit card and consolidation loan debts, along with rent and child support, amounted to $1,607 in monthly liabilities. Bert further wrote down the figure "$5,600" in the blank marked for gross monthly income. This Court determines $5,600 to be one-twelfth of the debtor's $68,000 yearly gross salary earned as an airline pilot. Bert calculated 35% of the gross monthly income to be $1,907, presumably to compare this 35% of income figure to the total monthly liabilities in deciding whether O'Connor had sufficient surplus net income to qualify for the loan.
The following two notations appear in the margins of the debt-to-income ratio section of Plaintiff's Exhibit 5, the loan request form. On the left margin, Bert noted "+ Nat'l Guard $6,000 year," which reflects the debtor's gross salary derived from service in the National Guard. This Court assumes in the absence of evidence to the contrary that the $6000 National Guard salary noted in the margin is additional yearly gross income not included in the $5,600 Bert calculated as monthly gross income derived from the debtor's airline pilot salary. On the right margin, the words "after 29%" appear without explanation. This Court determines that 29% of the listed $5,600 gross income would be $1,624, from which it notes that the listed monthly payment of $1,607 is less than 29% of the listed gross monthly income. This Court is at a loss to determine exactly what "after 29%" means, but in the context of a complaint to determine a debt nondischargeable based on a false financial statement, *805 all notations on the statement are significant.
On August 4, 1987, O'Connor met with Bert to sign for the loan. Bert approved a 48-month loan at 9.86 percent interest with a monthly loan payment of $579.27, the first of which was due in six weeks on September 15, 1987. Bert issued a check for $18,000 payable to Thomas W. O'Connor and City Wide Auto Mart. O'Connor endorsed the check and turned it over to Sher.
Sher did not pay off the ALPA loan before August 15, 1987. Sher attempted in late October and early November 1987 to pay off the debtor's ALPA loan, however, in each case ALPA returned Sher's check for insufficient funds. No attempt was ever made to pay off the IHMV loan. There is no evidence that either the 1983 Mercedes securing the ALPA loan nor the 1984 Mercedes securing the IHMV loan ever existed. The debtor never took possession of, rode in, or saw any of the four "grey market" cars bought in this manner. The vehicle identification number ("VIN") appearing on the debtor's bill of sale from Sher, which Bert used to complete loan documents, was false, a fact of which the debtor says he was unaware at the time he applied for the IHMV loan. The faulty VIN prevented the debtor from getting insurance on the car upon purchase, but O'Connor says he never suspected that the car did not exist. Mr. Sher has been indicted for fraud arising out of his "grey market" Mercedes scheme. The debtor defaulted on both the ALPA and the IHMV loans and declared bankruptcy in an attempt to have these debts discharged.
The plaintiff IHMV seeks to have its debt declared nondischargeable under § 523(a)(2)(A) and (B), alleging fraud and the use of a false financial statement to obtain money. IHMV alleges fraud in that the debtor knowingly or recklessly pledged as collateral a nonexistent Mercedes Benz to secure a loan, and that the debtor knew or should have known that the vehicle identification number was false at the time he applied for the loan. The debtor alleges that he only found out about the nonexistence of the cars when the FBI told him months later. In fact, he testified that someone told him they saw his Mercedes being driven in Chicago by Sher. The debtor says that any car insurance problems the faulty VIN caused arose after applying for the loan.
IHMV alleges use of a false financial statement in that the debtor failed to disclose the ALPA loan on the IHMV loan request form with the intent to deceive. Testifying by written deposition read into evidence by counsel, Bert denies that the debtor made any disclosure of the ALPA loan verbally or in writing on the loan request work sheet. Bert further testifies that had the debt to ALPA been disclosed, she would not have made the loan since O'Connor's debt-to-income ratio would have been too high. Plaintiff's Exhibit 1, Deposition Upon Written Questions, No. 18.[1]
*806 O'Connor admits that he gave Bert the information found on the loan request, adopts the loan request as his financial statement, and admits that the outstanding ALPA loan does not appear in the debt schedule. In oral deposition and in live courtroom testimony, O'Connor explained that the absence of the ALPA loan from the financial statement did not concern him because he was sure Sher would pay it off before the due date of the initial IHMV monthly payment. Twice in the past, Sher had paid the entire principle balance of the prior IHMV loans before the due date of the first monthly payment. The debtor says he honestly felt that the loan being oversecured by a "grey market" Mercedes, which would be sold soon at a profit and the loan for its purchase paid off, was not a relevant factor in determining whether he would be able to make the payments on the IHMV loan. O'Connor also states that while he cannot remember for sure whether he discussed the "grey market" Mercedes deal and the outstanding ALPA loan with Bert, he might have done so.

CONCLUSIONS OF LAW
Plaintiff IHMV contends that defendant O'Connor's indebtedness to IHMV should be nondischargeable under 11 U.S.C. § 523 of the Bankruptcy Code. IHMV argues for nondischargeability under both § 523(a)(2)(A) and § 523(a)(2)(B).
Section 523(a)(2)(A) provides for an exception to the discharge of a debt to the extent obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." IHMV alleges that O'Connor obtained the IHMV loan by pledging a nonexistent 1984 Mercedes Benz automobile as collateral. IHMV emphasizes the fact that the VIN taken from the bill of sale did not correspond to the Mercedes Benz VIN system.
Nondischargeability of debt on the basis of false pretenses, false representation, or actual fraud, requires the plaintiff to establish that the debtor made representations which he knew were false at the time they were made, with the intent to deceive a creditor who relied on the false representations, and which were the proximate result of the loss. E.g., In re Gadsden, 128 B.R. 45 (E.D.N.Y.1991); In re Schwartz & Meyers, 130 B.R. 416 (S.D.N.Y.1991). This Court finds that O'Connor made representations as to the VIN and the existence of the 1984 Mercedes, and that IHMV relied on the existence of such an automobile in making the loan to O'Connor.
However, IHMV has not met its burden to show that O'Connor knew that the representations were false when made. O'Connor gave Bert the VIN appearing on the Bill of Sale from Sher, and although the insurance company requested from the debtor a corrected VIN for insurance purposes, IHMV has presented no other relevant evidence that would show that O'Connor knew that the VIN was false at the time he applied for the loan.
The scienter element may be proved by showing that the debtor made the representation with such reckless disregard for the truth as to constitute willful misrepresentation. See, e.g., In re Haining, 119 B.R. 460 (D.Del.1990). IHMV argues that O'Connor showed reckless disregard for the truth in not checking to verify that the VIN provided by City Wide was accurate or that there existed a 1984 Mercedes Benz automobile. This Court declines to find such conduct to be in reckless disregard for the truth. In the majority of automobile purchases the buyer does not compare the VIN written on the Bill of Sale against the VIN on the automobile itself, nor does the buyer call the VIN in to the manufacturer's corporate headquarters for verification.
In the instant case, O'Connor had no reason to doubt the existence of the 1984 Mercedes, and therefore, did not show reckless disregard for the truth in failing to ask to see the vehicle. O'Connor had *807 little interest in how the car looked, how it drove, or even what color it was. O'Connor's only interest in the car was that it could be refitted by Sher and then resold at a profit. O'Connor had successfully conducted two such transactions previously with IHMV without seeing either of the cars involved in those transactions. Under the circumstances in this case, this Court holds that O'Connor's representations concerning the VIN and the existence of the 1984 Mercedes Benz automobile were not made in reckless disregard for the truth. Moreover, IHMV has failed to show any intent to deceive on the part of O'Connor in making such representations. Accordingly, § 523(a)(2)(A) does not render the debt at issue nondischargeable.
IHMV seeks to find O'Connor's debt to be nondischargeable under § 523(a)(2)(B). Section 523(a)(2)(B) states in pertinent part:
(a) a discharge does not discharge an individual debtor from any debt
(2) for money . . . to the extent obtained by 
(B) use of a statement in writing 
(i) that is materially false;
(ii) respecting the debtor's . . . financial condition;
(iii) on which the creditor reasonably relied; and
(iv) that the debtor caused to be made or published with the intent to deceive. . . .
Case law requires the plaintiff to prove the following elements:
(1) The debtor obtained money;
(2) by a financial statement;
(3) in writing;
(4) concerning the debtor's financial condition;
(5) that the financial statement was materially false;
(6) that the debtor caused it to be made with the intent to deceive the creditor;
(7) that the creditor relied on it;
(8) that such reliance was reasonable; and
(9) that the loss was the proximate result of the making of the financial statement.
In re Hott, 99 B.R. 664, 667 (Bankr. W.D.Penn.1989) (citing In re Pascucci, 90 B.R. 438 (Bankr.C.D.Cal.1988)). The debtor does not contest that he obtained money by a financial statement in writing concerning his financial condition. However, this Court has serious questions as to materiality, intent, reasonable and actual reliance, and causation.

I. Materiality
A materially false statement is one that "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." Jordan v. Southeast National Bank (In re Jordan), 927 F.2d 221 (5th Cir.1991). In determining whether a false financial statement is material, a relevant though not dispositive inquiry is "whether the lender would have made the loan had he known the debtor's true situation." In re Bogstad, 779 F.2d 370, 375 (7th Cir. 1985). In the Bogstad case, the creditor proved the falsity of the financial statement in which the debtor over represented his net worth, but failed to prove the falsity was material. According to the creditors testimony, the Court of Appeals found that the bank would have made the loan even at the debtor's corrected lower net worth. Bogstad, 779 F.2d at 374-375.
In view of the figures Bert wrote on the loan request form and her uncorroborated written deposition testimony, IHMV has not proven the material falsity of the debtor's financial statement. Bert testified that she would have never approved the loan had she known about the ALPA debt because the debt-to-income ratio would have been too high. It stands to reason that where a credit union qualifies a borrower for a loan by measuring his debt-to-income ratio, the credit union must consider what the borrower's debt-to-income ratio would be after approval of the requested loan. Were a credit union to only consider the pre-loan debt-to-income ratio, then a *808 borrower with a low ratio would ostensibly qualify for a loan of any amount, even if it boosted his ultimate debt-to-income ratio to the point that the debt service would exceed the income for the month. In deciding the issue of materiality, whether IHMV would have made the loan knowing of the outstanding ALPA obligation, this Court must determine what weight IHMV gives to its debt-to-income ratio test and whether O'Connor's true ratio exceeds the limit.
According to the loan request form, O'Connor's total monthly payment was $1,607. Plaintiff's Exhibit 5. Thirty-five percent, which this Court in the absence of other evidence presumes to be the plaintiff's debt-to-income ratio qualifying limit, of the debtor's gross monthly income of $5,600 equals $1,960. Subtracting the monthly payments of $1,607 from the debt-to-income ratio limit of $1,960 leaves $353 of "disposable" net income with which to make new loan payments within IHMV's debt-to-income ratio limit of 35%.
Somehow IHMV found the debtor's $353 monthly surplus sufficient extra monthly net income to advance O'Connor a new car loan with a monthly payment of $579. IHMV must have known based on even the false financial statement that once it issued the loan, O'Connor's total monthly payments would balloon to $2,186, increasing his debt-to-income ratio over the 35% qualifying limit to 39%. In view of the fact that IHMV qualified O'Connor at a debt-to-income ratio of 39%, it appears to have ignored its own self-imposed limitation. If the 35% ratio printed on the loan request form is not the limit, and a 39% debt-to-income ratio, which ultimately resulted from the IHMV loan, is not "too high," then what debt-to-income ratio is "too high?"
In comparing Pat Bert's written deposition testimony with the loan request form documenting the credit union's loan qualifying standards, this Court finds inconsistent the plaintiff's evidence of the debt-to-income ratio limit. This Court cannot determine from the evidence at what debt-to-income ratio a borrower would be disqualified. For the foregoing reasons, it appears to this Court that IHMV qualified the debtor for a loan at a debt-to-income ratio above the 35% limit printed on the form, and that no evidence exists to determine what debt-to-income ratio would be "too high" to qualify for a loan. This Court cannot determine from the evidence presented at trial that IHMV would not have approved the loan had it known about the outstanding ALPA obligation. This Court finds that IHMV has failed to prove by a preponderance of the evidence that the absence of the ALPA loan made the debtor's loan request form materially false.
Whether or not IHMV gave any consideration to the annual National Guard income of $6,000 is not clear from the exhibit or from the depositions of Bert. In the absence of any evidence to the contrary, this court will assume that IHMV did not rely on the debtor's monthly National Guard income of $500. But even if IHMV had relied on that income, the ultimate debt-to-income ratio according to the foregoing analysis would have been 36%, still in excess of the 35% ratio printed on the form.

II. Intent
Once the creditor has proven its prima facie case by producing proof of actual knowledge of falsity, then the burden shifts to the debtor to rebut the presumption of intent to deceive. Standard Federal Bank v. Compton (In re Compton), 97 B.R. 970 (Bankr.N.D.Ind.1989) (citations omitted). Often a court must look to the circumstances surrounding a transaction and infer an intent to deceive from the debtor's conduct. Id. at 979. In the Compton case, the debtor took out two previous car loans and turned the proceeds over to her boyfriend, a car dealer. The cars securing the two loans, as well as the proceeds from their subsequent sales, "disappeared," leaving the debtor owing $22,000. Needing another car, the debtor, at the request for her boyfriend, applied for a third car loan, without disclosing the two prior debts.
Like the first two, the third car also disappeared at the hands of the boyfriend. The debtor in Compton could not explain *809 why she omitted the $22,000 loan debt on her third loan application. The court determined that the debtor knew that if she listed the debt then she would surely be denied the third loan. The court in Compton further found from the circumstances that the debtor knew or should have known of her boyfriend's fraudulent activities. The court inferred an intent to deceive from the debtor's prior knowledge of her boyfriend's fraudulent intent and found the third loan debt to be nondischargeable in bankruptcy.
In the case at bar, O'Connor admits that the loan request form does not mention the ALPA loan outstanding at the time of the application, but objects to the presumption that by not disclosing it on the form he intended to deceive IHMV. O'Connor explains that he thought it unimportant whether the ALPA loan appeared because Sher had paid off two previous IHMV loans and promised to pay off the ALPA loan before August 15, a month before the first IHMV payment was due. O'Connor also states that he might have discussed the "grey market" deal and the ALPA loan with Bert, who then could have decided not to write it down. There is no evidence that O'Connor knew of Sher's fraudulent intent at the time he applied for the IHMV loan.
To satisfy its burden of establishing an intent to deceive under § 523(a)(2)(B)(iv), the bank must prove that the debtor committed actual fraud, that he intended to defraud the bank by a false financial statement. Constructive or implied fraud is insufficient to bar the discharge of the debt to the bank. Signet Bank v. Wingo (In re Wingo), 113 B.R. 249, 251 (W.D.Va.1989). This Court requires the creditor to prove that the debtor published the statement with the intention and purpose of deceiving the creditor. Blake v. Handy, (In re Handy), 35 B.R. 912, 914 (Bankr.E.D.Va. 1983) (adopting the test in Sweet v. Ritter Finance Co., 263 F.Supp. 540, 543 (W.D.Va.1967), which interprets § 17(a)(2) of the Bankruptcy Act, the precursor to § 523(a)(2)(B) of the Bankruptcy Code). It appears to this Court that the August 1 ALPA loan payment by O'Connor, while suggesting knowledge of the outstanding ALPA loan at the time of the IHMV loan application, is not sufficient evidence of an intent to defraud IHMV. Unlike the facts in Compton where the court inferred intent to deceive from the debtor's knowledge of her boyfriend's fraudulent activities, this Court finds that O'Connor had no knowledge of Sher's fraudulent activities, particularly in light of the fact that two prior transactions with IHMV had been successfully consummated, and refuses to infer an intent to deceive IHMV solely from evidence of knowledge of an outstanding debt.

III. Reasonable Reliance
The court in Dominion Bank v. Wingo, (In re Wingo), 112 B.R. 141 (Bankr. W.D.Va.1990), defined the proper legal standard in determining the reasonable reliance requirement. To establish reasonable reliance upon a false financial statement, a creditor must prove that reliance was objectively reasonable, and that there was actual reliance. See In re Wingo, 112 B.R. 141 (W.D.Va.1990). The Code does not statutorily define exactly what constitutes "reasonable reliance." See 11 U.S.C. § 523(a)(2)(B)(iii). Case law, however, reveals that reasonable reliance is to be objectively determined by the fact finder given the totality of the circumstances. In re Figge, 94 B.R. 654, 665 (Bankr.C.D.Cal. 1988). Reliance will be found to be reasonable if it is demonstrated by the creditor that had the false representation or omission been known, the credit would not have been extended. In re Carr, 49 B.R. 208, 210 (Bankr.W.D.Ky.1985). In cases of lending institutions this standard is expanded to compare the creditors' actual conduct with debtor; the industry-wide practice; and the surrounding circumstances of the case. In re Compton, 97 B.R. 970, 979 (Bankr.N.D.Ind.1989); In re Pascucci, 90 B.R. 438, 446-447 (Bankr.C.D.Cal.1988). Finally, where a creditor is on notice of the statement's inaccuracy, its reliance on that statement is unreasonable. A creditor cannot ignore "red flags" and expect to benefit from nondischargeability. Teates v. *810 Kuranda (In re Kuranda), 122 B.R. 264, 269 (Bankr.E.D.Va.1990).
Upon reviewing the various cases in which reliance was found unreasonable, the Wingo court stated: "There is no bright line test for reasonableness; therefore, there can be other factual situations which would render reliance unreasonable." 112 B.R. at 145. That court also stated:
What must be kept in mind is Congress' intent in adding the "reasonableness" requirement to § 523(a)(2)(B). It seems to me that what Congress intended by incorporating the reasonable reliance requirement into § 523 was to prevent creditors from using a misrepresentation in a financial statement to prevent the debtors discharge when, in fact, the financial statement playing no meaningful part in the decision of the creditor to extend credit. In order words, Congress was making it more difficult for creditors to use § 523 in order to argue that a claim is not dischargeable.
Under the Wingo standard, the creditor must satisfy two separate tests to meet the reasonableness requirement. First, the creditor must prove a reasonable reliance by an objective standard. Next, the creditor must prove that it actually relied on the statement, a subjective standard. 112 B.R. at 145. Under the subjective test, the creditor has the burden of persuasion to prove that the financial statement was a substantial factor in its decision to extend the loan. A "substantial factor" must be one that weighed in the balance with other factors in making the credit decision. The weight it bears will vary from case to case and cannot be quantified. Id.
In the Wingo case, the bankruptcy court found that the bank relied more heavily on the debtor's status as successful, prosperous real estate agents, their prior business dealings with the bank, and their spotless credit history, than it did on their materially false financial statement. The bank appealed and the district court remanded the case to the bankruptcy court to determine whether reliance was objectively reasonable, and whether the creditor actually subjectively relied on the financial statement. As instruction, the district court said that "while there is no bright line test for what constitutes sufficient actual reliance, it is clear that merely glancing at an objectively reasonable financial statement does not suffice to meet the subjective reliance test." Wingo, 112 B.R. at 146; accord Founders Bank of Arizona v. Moore (In re Moore), 118 B.R. 64, 66 (Bankr.N.D.Tex. 1990); John Deere Company v. Myers, 124 B.R. 735 (Bankr.S.D.Ohio 1991); Hoffman & Kuhn, Inc. v. Branham (In re Branham), 126 B.R. 283 (Bankr.S.D.Ohio 1991).
In the case at bar, the requirement of reasonable and actual reliance is closely related to the requirement of a materially false statement discussed supra. Bert testifies that she relied on the statement in that had the ALPA loan been listed, O'Connor's debt-to-income ratio would have been too high to qualify for a loan. There is no corroborating evidence defining what is "too high" a debt-to-income ratio. As stated earlier, upon executing the IHMV loan, O'Connor's debt-to-income ratio was at least 39% based on the false statement of debts, and even if Bert included the extra National Guard salary, the ratio would be 36%. Both scenarios exceed the limit that the evidence shows to be the IHMV debt-to-income ratio maximum. Based on a debt ratio limit of 35%, as stated on the form, O'Connor should have not qualified for the IHMV loan at all. Bert states that she actually relied on the false statement in deciding to approve the IHMV loan, however, that loan caused O'Connor's debt ratio to exceed the maximum limit by 4%. This court finds Bert's testimony by written deposition to be inconsistent with the facts found upon analysis of the loan request form. Such inconsistency in the plaintiff's evidence creates doubt that plaintiff actually relied on its self-imposed debt-to-income ratio limit or on the debtor's financial condition stated in the loan request form.
It appears to this Court that IHMV has not proven by a preponderance of the evidence that it actually subjectively relied on the financial statement. This Court finds it more probable than not under the totality of the circumstances of this particular factual *811 situation that the plaintiff relied instead on the debtor's high professional salary, low living expenses, and an established relationship in which during the past 10 months two $20,000 "grey market" loans were paid off about the time of the due date of the first monthly payment. Although Bert in her written deposition stated that she would have noted the ALPA debt on the form had O'Connor mentioned anything about it, O'Connor testified in open court that the absence of the loan from the list of debts was of no concern. The ALPA loan would be promptly paid off and would not be a factor in his ability to repay the IHMV loan.
O'Connor also testified that he might have mentioned the loan to Bert as one that would be paid off immediately. That statement, if made, may explain the annotation "after 29%" that appears on the financial statement in Bert's handwriting. This Court notes that presuming a payoff of the ALPA note, O'Connor's debt ratio would have been 28.7%, a pre-loan debt ratio at which O'Connor could qualify for his third IHMV car loan in 10 months. While this Court cannot speculate as to what Bert actually thought at the time, this Court notes that, according to Bert, inclusion of the ALPA debt would have made O'Connor's debt-to-income ratio "too high" to qualify for the loan. Yet, had Sher paid off the ALPA note as O'Connor believed he would (and might have mentioned to Bert), the obligation existing at the time of the application would not have affected O'Connor's ability to make payments on a new IHMV loan.
The burden of persuasion rests upon IHMV, however, the Court is constricted by the lack of adequate evidence to find reliance, is unable to observe the demeanor of the plaintiff's witness, and is proscribed from examining the witness due to plaintiff's decision to proceed in its elected manner. See supra note 1. Additionally, based on the facts that IHMV approved a loan that resulted in a debt-to-income ratio exceeding its ratio qualifying limit, and that analysis of the figures on the loan request form reveals that fact, the Court cannot find that IHMV's reliance on the debtor's false financial statement was reasonable.

IV. Proximate Result
Since nondischargeability on the grounds of false financial statement is in the nature of fraud, bankruptcy case law adopts the element of proximate result from tort-based fraud. The cases require the creditor to prove the element proximate result, that the creditor sustained damages as a proximate result of the debtor's financial statement, to prevail under 11 U.S.C. § 523(a)(2)(B). See Danns v. Household Finance Corp., 558 F.2d 114, 116 (2d Cir. 1977) (standing for the proposition that a refinancing loan is nondischargeable only to the extent of the debtor's fraud); North Shore Savings and Loan Asso. (In re Jones), 88 B.R. 899 (Bankr.E.D.Wis.1988); Regency National Bank v. Blatz (In re Blatz), 37 B.R. 401, 405-06 (Bankr. E.D.Wis.1984).
The court in the Blatz case penalized the debtor only for the consequences of its fraud involving a false financial statement. The debtor refinanced a loan using a false financial statement. The court found only that part of the debt incurred after the refinancing to be nondischargeable. 37 B.R. at 405. The court discharged the debt which existed before the refinancing as being a loss that did not proximately result from the debtor's fraud.
A similar principal applies to the case at bar. IHMV issued its loan check to both the debtor and City Wide, although only the debtor was liable on the note. The debtor endorsed the loan check and turned it over to Sher at City Wide without any knowledge of Sher's fraudulent ends. The damage to the bank proximately resulted from Sher's fraud and the nonexistence of the Mercedes securing its loan, not the conduct of the debtor. Certainly the debtor is liable for the loss to IHMV, but the element of proximate result required to make that debt nondischargeable in bankruptcy does not exist as to the debtor.
This Court finds that IHMV has failed to prove actual fraud under 11 U.S.C. *812 § 523(a)(2)(A). The debtor had no knowledge of the invalid VIN and no knowledge that the cars did not exist at the time he applied for the loan. This Court also finds that IHMV failed to prove by a preponderance of the evidence that O'Connor's financial statement was materially false, that he published it with intent to deceive, that IHMV reasonably relied on the statement, and that the loss proximately resulted from the financial statement. For the foregoing reasons, this Court finds O'Connor's debt owed to IHMV Credit Union to be dischargeable in bankruptcy.
An order will be entered in conformity with this opinion.
NOTES
[1] The defendant objected to the introduction into evidence of Bert's deposition on written questions as inadmissable hearsay. The plaintiff argued for use of the deposition testimony at trial under an exception to the hearsay rule on the grounds that the witness was unavailable. Fed.R.Civ.Pro. 32(a)(3)(B); Fed.R.Evid. 804(b)(1). The court notes that the defendant did not file cross questions for the Court's consideration as allowed under Rule 32(a).

While the plaintiff prevailed in its argument for use of written deposition testimony, it must be recognized that it is a task of untold difficulty for a court to determine the credibility of a witness from a cold transcript, when the appearance and demeanor of that witness obviously cannot be taken into account. Parties who are content to submit a witness' testimony solely be means of a deposition must nevertheless be held to assume the risk that the court will make a credibility determination from the transcript itself. Associates Commercial Corp. v. Reavis (In re Reavis, 92 B.R. 380, 386 n. 1 (Bankr.W.D.Mo. 1988). In the Reavis case, the bankruptcy court found the deposition of the witness, who was employed by an agent of the plaintiff, to be highly suspect and not based on any objective or independently reliable source. The court found it was warranted in disregarding the substance of the plaintiff's witness' deposition testimony on grounds of credibility. 92 B.R. at 385-86. "Observation of the witness is likely to give a more accurate feel than reading a cold record." NLRB v. Majestic Weaving Co., 355 F.2d 854 (2d Cir.1966) (Friendly, J.). The importance of live witnesses at a trial involving fraud is evident. The demeanor of the witness before the trier of fact, with an opportunity to appraise credibility, may well mean the difference between acceptance and rejection of crucial testimony. Oil & Gas Ventures v. Kung, 250 F.Supp. 744, 756 (1966).