**In re Raymond BRANHAM dba B & B Enterprises, Debtor.**

**HOFFMAN & KUHN, INC., Plaintiff,**

v.

**Raymond BRANHAM, Defendant.**

Bankruptcy No. 2–88–06653.

Adv. No. 2–89–0165.

United States Bankruptcy Court, S.D. Ohio, E.D.

April 23, 1991.

Joseph C. Winner, McFadden & Winner, Columbus, Ohio, for plaintiff.

John E. Sullivan, III, Noble & Sullivan, Cleveland, Ohio, for debtor/defendant.

Larry J. McClatchey, Emens, Hurd, Kegler & Ritter, Columbus, Ohio, Chapter 7 trustee.

Charles M. Caldwell, Office of the U.S. Trustee, Columbus, Ohio, Asst. U.S. Trustee.

## OPINION AND ORDER ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

R. GUY COLE, Jr., Bankruptcy Judge.

### I. *Introduction*

This proceeding is before the Court following the trial of a complaint filed by Hoffman & Kuhn, Inc., the plaintiff, to determine the dischargeability of a debt owed it by Raymond Branham, the defendant. The Court has jurisdiction to hear this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(I).

### II. *Statement of Uncontested Facts*

Hoffman & Kuhn, Inc. ("H & K"), an Ohio corporation formed by William Hoffman ("Hoffman") in 1959, is in the business of leasing automobiles, trucks and commercial equipment. Hoffman serves as H & K's president and chief executive officer; his son, Jeff, serves as the company's vice-president.

Raymond Branham (sometimes referred to as "Branham"), at all relevant times, held ownership interests in businesses involved in the exploration and drilling for oil and gas in Ohio. Hoffman and Branham first met in the fall of 1983 when Branham purchased drilling equipment from H & K—a Gordon–Denver mud pump—for approximately $30,000. Later that year B & B Drilling, Inc., a corporation in which Branham believes he held a significant ownership position—leased additional oil and gas drilling equipment from H & K pursuant to two lease agreements. B & B made all payments under these leases and was viewed by H & K as a satisfactory lease customer.

In 1985, B & B Drilling was one of at least two companies operated by Raymond Branham and his brother, John, that were in the oil and gas business. The two brothers divided their responsibilities in that

company: Raymond conducted the company's field operations while John, a New York automobile dealer, raised capital for B & B Drilling and other joint enterprises. Eventually, John Branham claimed that Raymond held no ownership position in B & B Drilling because corporate shares were never issued to him.

Branham contacted Hoffman during the summer of 1985 in response to H & K's advertisement for the sale of a used truck. Branham drove from his home in Stockport, Ohio, to H & K's offices in Columbus to inspect the truck and, while there, became interested in a Challenger Model M280 oil and gas drilling rig (the "Challenger Rig") which H & K had repossessed from a customer several months earlier. Because of the business downturn in the oil and gas industry in Ohio and elsewhere, and the resultant possibility that an independent oil and gas operator might have difficulty making payments under a lease, H & K wished to sell the Challenger Rig outright; it did not wish to lease the rig or finance its purchase. Branham, however, insisted upon a lease, with an option to purchase, because he was unable to obtain an institutional loan. Branham's poor credit history, and lending institutions' general hesitation to make loans to independent oil and gas operators at that time, were the principal reasons for Branham's inability to obtain such a loan.

The Challenger Rig, a large and expensive piece of equipment, was in below-average condition even after H & K had prepared it for sale, and H & K was incurring significant interest charges and associated carrying costs each month it held it in its inventory. In consideration of these and other factors, H & K decided to lease the Challenger Rig to Branham. H & K also agreed to lease a Mack tandem tractor, a Roger's low-boy flatbed trailer, and a Caterpillar bulldozer. After further discussions, Branham and Hoffman agreed that H & K would lease the Challenger Rig, the tractor, the trailer, and the bulldozer (collectively "the Equipment") pursuant to three lease agreements. The parties agreed further that the Equipment would be leased to a new company named Branham Drilling, Inc. ("BDI"). Branham represented that he had a major ownership and managerial interest in BDI.

Lease agreements were signed by Hoffman, as H & K's president, and by Branham. The first lease, executed on August 28, 1985, provided for the lease of the tractor and trailer. The second lease, signed on September 5, 1985 by Branham, expressly indicated his position as BDI's president and provided for the lease of the bulldozer. The third lease, signed on September 15, 1985, covered the lease of the Challenger Rig. Branham executed a written personal guaranty of performance of the terms and conditions of each lease agreement.

By early 1986, BDI had defaulted under the terms and conditions of the three leases. Branham attributes BDI's default to weather-related difficulties the company encountered in conducting drilling operations near Lake Erie during the winter months. After several discussions and correspondence with Branham, Hoffman concluded that BDI was unable to cure the defaults. Hoffman thereupon requested the return of the equipment to H & K. By May, 1986, the Equipment had been surrendered to H & K at its offices in Columbus.

H & K thereupon filed suit against BDI, Raymond Branham and John Branham in the Court of Common Pleas, Franklin County, Ohio. Following a trial on the complaint, judgment was entered on November 16, 1987, against BDI and Raymond Branham in the amount of $109,025.10 as a result of the defaults of BDI under the three lease agreements and the liability of Branham pursuant to his personal guaranties. The Court also entered judgment in favor of John Branham, finding that he was not a "partner with Raymond Branham, did not hold himself out as a partner and did not authorize anyone to represent he was a partner of Raymond Branham." Plff.'s Exh. 8, Para. C.

On December 29, 1988, Branham filed a Chapter 7 petition in this Court. The instant complaint was filed on April 17, 1989. A bench trial was held on March 20–21,

1991, following which the matter was taken under advisement.

### III. Issues Presented for Decision

1. Whether H & K must prove its case by a preponderance of the evidence or clear and convincing evidence.

2. Whether Branham obtained property by use of a statement in writing respecting his financial condition; and, if so, was the statement materially false.

3. Whether H & K reasonably relied on a materially false financial statement from Branham.

4. Whether Branham caused to be made or published a false financial statement with the intent to deceive H & K.

### IV. Conclusions of Law

A. Evidentiary Standard

Section 523(a)(2)(B) of the Bankruptcy Code provides for an exception to discharge of an obligation which is:

(2) for ... property, ..., or an extension of credit, to the extent obtained by—

....

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such ... property, ... or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; ...

The Sixth Circuit Court of Appeals has held that a creditor must prove its case under § 523(a)(2)(B) by clear and convincing evidence. *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163 (6th Cir. 1985). However, in *Grogan v. Garner*, — U.S. —, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), the Supreme Court recently ruled that the lesser preponderance-of-the-evidence standard applies in dischargeability actions under § 523(a), thus reversing the law in this circuit.

■ It is generally accepted that "a 'preponderance of the evidence' exists when such evidence has, upon consideration and comparison with that opposing it,

more convincing force and produces in the mind of the trier of fact a belief that such evidence is more likely true than not true." *U.S. v. Kansas Gas & Elec. Co.*, 215 F.Supp. 532, 543 (D.Kan.1963). *See Merriman v. Hartfile*, 112 Ohio App. 155, 175 N.E.2d 531 (1959). This evidentiary standard applies in this proceeding even though the instant complaint was filed before *Grogan* was issued. The general rule is that a court must apply the law in effect at the time it renders its decision. *Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268, 281, 89 S.Ct. 518, 525–26, 21 L.Ed.2d 474 (1969) (A change in the law between a *nisi prius* [trial court] and an appellate decision requires the appellate court to apply the changed law.) *See also American Trucking Assn., Inc. v. Smith*, — U.S. —, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990); *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, — U.S. —, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990). Accordingly, the plaintiff must prove its case by a preponderance of the evidence.

B. Whether Raymond Branham Published a False Financial Statement to Obtain Property

■ The parties agree that the evidence is in direct conflict as to whether Branham published the written statement concerning his financial condition upon which this action is premised. According to H & K, Branham delivered the statement (the "Financial Statement") to it before the first lease was executed; thus, prior to August 28, 1985. H & K alleges further that the Financial Statement was published by Branham for the purpose of obtaining the Equipment pursuant to the three lease agreements. And, of course, H & K claims that the Financial Statement was false.

Branham asserts that he did not publish the Financial Statement upon which the complaint is premised. He claims that in negotiations about possible leasing arrangements, Hoffman asked him if he had a personal financial statement which had been completed within the past year. Branham claims he told Hoffman that the only financial statement he had completed

in that time frame was a financial statement submitted by B & B Enterprises, a partnership composed of himself and his brother, to the Ohio Department of Natural Resources, Division of Oil and Gas, in 1984 in connection with certain bonding requirements imposed by state law on oil and gas drillers. Branham claims he told Hoffman that this financial statement (hereinafter "the Bonding Statement") listed his assets and liabilities along with those of his brother. Branham alleges that Hoffman then asked him to complete a blank financial statement that was attached to or on the reverse side of a proposed lease, and that he did so, but the copy of the executed lease(s) Hoffman later sent him by mail did not have the hand-written financial statement attached. Branham has not seen this financial statement since he completed it, he says.

The Financial Statement and Bonding Statement are the same form "financial statement" supplied by the Department of Natural Resources for filing by oil and gas drillers. The two statements are identical in all material aspects except that there are no references to B & B Enterprises or John Branham on the Financial Statement—the document allegedly given to H & K. Conversely, the Bonding Statement expressly indicates that Raymond Branham did business as B & B Enterprises and that John Branham was either a member or partner of the firm when the Bonding Statement was filed on July 30, 1984. One other difference is that the Financial Statement was not notarized, whereas the Bonding Statement contains a notarial stamp and signature. Both statements are signed by Raymond Branham and show a "net financial worth in Ohio" of $1,688,000. Branham's signature on the Financial Statement was written over typewriter correcting fluid.

Branham, while admitting that his signature appears on the Financial Statement, contends he did not give the statement, or cause it to be given, to H & K. His wife, Patsy, testified she mailed the Financial Statement to Hoffman in response to his two phone calls in October, 1985—after the leases had been executed. Patsy Branham posits that she obtained the Financial Statement from a box of financial statements which were preliminary draft, or reproduced, copies of the Bonding Statement. She does not explain why there are no references to B & B Enterprises or John Branham on the Financial Statement even though it is clear that the two brothers conducted business as such in 1984.

Patsy Branham asserts further that she mailed the Financial Statement to Hoffman, but did not advise her husband of the mailing. Branham claims he first learned that H & K possessed the Financial Statement at a deposition taken in 1987 by H & K's counsel in connection with the Common Pleas' case. Branham claims to have been extremely upset by his wife's mailing of the Financial Statement to H & K without his consent or knowledge.

While attempting to separate the truth from falsity is no easy matter in this action, the witnesses supporting Branham's version of the events surrounding the execution and delivery of the Financial Statement to H & K are lacking in credibility. Patsy Branham, whose testimony is pivotal to Branham's defense, admits that she is "on a lot of medication" and has "always had trouble with dates." Patsy Branham Deposition at 9. This admission is borne out by her inability to remember numerous events, dates, and general time frames, even of fairly recent vintage. She claims, nonetheless, to remember with exactness the number and month of phone calls made by Hoffman, and that she mailed the Financial Statement in October, 1985. She also claims to recall that the three leases had been signed by the time she mailed the Financial Statement to H & K.

Although the submission of her testimony by way of deposition has deprived the Court of an opportunity to evaluate her conduct and demeanor, the Court finds that her testimony is implausible. Not only is she evasive in answering questions, but her answers lack candor and credibility. For example, the Court does not believe that she remembers the events of October 1985 so precisely, but cannot recall much more memorable events of later years. Nor can

the Court accept her assertion that she mailed the Financial Statement to H & K, but never told her husband that it was mailed. Branham's admission that he signed the Financial Statement makes this explanation particularly incredible. It seems unlikely that he would have signed a draft or a photocopy; it is far more likely that he signed an altered copy of the Bonding Statement and submitted it to H & K.

Branham also relies upon the deposition testimony of Jack Hedges, a former employee of one of his companies. Hedges apparently accompanied Branham to Columbus in 1985 to pick up the Challenger Rig and claims to have been in Hoffman's office when he requested a current financial statement from Branham. Hedges testified that Branham answered by noting that the Bonding Statement the brothers submitted to the Department of Natural Resources in 1984 was the only financial statement he possessed. Hedges claims that Hoffman then asked Branham to send him a copy of the Bonding Statement upon his return to Stockport and also requested that Branham complete at that time a blank financial statement appearing on the back of a lease agreement. Hedges avers that he witnessed Branham filling out the blank financial statement while Branham sat in Hoffman's office. According to Hedges, Branham promised Hoffman that Patsy would mail Hoffman a copy of the Bonding Statement. Branham has made no similar assertion; in fact, if he is to be believed he had no idea that his wife mailed the Financial Statement until 1987.

Examining the diametrically opposed assertions of the parties, the Court is persuaded that the testimony of Hedges and that of Branham himself, is not credible. The Court accepts as more credible—and consistent with the evidence—the testimony of William and Jeff Hoffman. The Court's determination is buttressed by its observation of the witnesses at trial.

The Court finds further that the Bonding Statement was submitted to the Department of Natural Resources by B & B Enterprises in 1984. It listed Raymond Branham as owner and operator, and represent-

ed that he did business with John Branham as B & B Enterprises. Branham's wife, who handled much of the paperwork for her husband and the brothers' businesses, retained copies of the Bonding Statement. Upon Hoffman's request for a personal financial statement, either Branham or his wife altered a copy of the Bonding Statement by deleting all references to B & B Enterprises and John Branham. By these deletions, the altered statement made it appear that Raymond Branham operated individually, without any partners, and that he had a personal net worth of $1,688,000. The statement also made it appear that the assets and liabilities listed were those of Raymond Branham personally; there is nothing on the statement which would give any indication that the assets and liabilities of B & B Enterprises or John Branham were included.

Branham then submitted the altered statement to H & K with the intent of showing a personal net worth approaching $1.7 million. By excising all references to B & B Enterprises and John Branham, and representing that he was doing business individually, Branham knew that H & K likely would conclude that his personal net worth was substantial and, thus, lease the Equipment to him or his company. Branham did not obtain a notary's signature on the altered statement, however he signed it and represented that the statement concerned his individual financial condition.

Further, the Court cannot accept Branham's assertion that the Financial Statement is simply a preliminary draft or photocopy of the Bonding Statement. The Financial Statement very well may have been prepared by copying the Bonding Statement, deleting references to B & B Enterprises and John Branham, and then photocopying the altered form. Moreover, if the Financial Statement were, in fact, a draft or copy of the Bonding Statement, then it would have included John Branham's name since he was in business with his brother as B & B Enterprises in 1984 when the Bonding Statement was prepared. Furthermore, there is no discernible reason why Raymond Branham would have manually

signed a draft or photocopy of the Bonding Statement submitted to the state in 1984.

In short, the Court is persuaded that Branham caused to be made or published the Financial Statement by deleting with typewriter correcting fluid all references on the Bonding Statement to B & B Enterprises and his brother. He then signed the altered statement and, with the contemporaneous or subsequent knowledge of his wife, provided a copy of the Financial Statement to H & K prior to the signing of the first of the three leases on August 28, 1985.

## C. Material Falsity

■ A materially false financial statement is one that contains a "substantial or important untruth." *See Waterbury Community Fed. Credit Union v. Magnusson (In re Magnusson)*, 14 B.R. 662 (Bankr.N. D.N.Y.1981). Thus, the question is whether the Financial Statement meets this standard.

The Financial Statement—for some unexplained reason—contains a date of April 24, 1985. However, it was submitted to H & K by Branham in August, 1985, before the signing of any of the three leases. Branham admits that the Financial Statement does not accurately reflect his assets and liabilities as of those dates. Branham further admits that his financial net worth during the periods in question was substantially less than half the $1,688,000 stated. In fact, Branham's net worth was less than $300,000 between April and September of 1985. Branham maintains, however, that the Financial Statement was an accurate representation of the combined personal net worths of himself and his brother for that time period.

Having found that the Financial Statement is Branham's written statement of his financial condition for the period between April 24 and August 28, 1985, the Court finds further that Branham's overstatement of his personal net worth is a substantial and important untruth. Accordingly, the Financial Statement was materially false in April 1985, and upon its submission to H & K in August of that year.

## D. Deceitful Intent

■ H & K also must prove that Branham intended to deceive it through the submission of a materially false financial statement. Specifically, H & K must establish that the Financial Statement was either knowingly false or made with such gross recklessness as to its truth as to warrant a finding that Branham acted fraudulently. *Knoxville Teachers Credit Union v. Parkey (In re Parkey)*, 790 F.2d 490, 491–92 (6th Cir.1986) (citing *In re Martin*, 761 F.2d at 1167). Accepting the fact that few debtors will admit openly of deceitful intent, all the facts, including circumstantial evidence, may be relied upon to support such a finding. *Devers v. Bank of Sheridan, Montana (In re Devers)*, 759 F.2d 751, 754 (9th Cir.1985); *Fleet Consumer Discount Co. v. Liptak (In re Liptak)*, 89 B.R. 3 (Bankr.W.D.Pa.1988).

■ The Court concludes that Branham intended to deceive H & K in obtaining property and/or credit by way of the lease agreements at issue. His intent is evidenced by the deletion of B & B Enterprises and his brother's name from the Bonding Statement and submission of the altered statement as the Financial Statement. Branham knew the Financial Statement did not represent his personal net worth and that H & K would rely on its contents in evaluating his creditworthiness. Clearly, Branham caused the Financial Statement to be made or published with the intent to deceive H & K into approving the lease transactions based upon false financial representations.

## E. Reliance

The final prong of § 523(a)(2)(B) requires H & K to demonstrate that it reasonably relied on the debtor's false financial statement. This provision requires the Court to undertake a two-part analysis: (1) did H & K actually rely on the Financial Statement; and (2) was the reliance reasonable?

### 1. *Actual Reliance*

■ Direct proof of actual reliance is difficult to obtain. As a result, courts cus-

tomarily have found that actual reliance may be proven by circumstantial evidence. *First Nat'l Bank of Lansing v. Kreps (In re Kreps)*, 700 F.2d 372 (7th Cir.1983); *Northern Trust Co. v. Garman (Matter of Garman)*, 625 F.2d 755 (7th Cir.1980), *cert. denied*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981). Partial reliance on a false representation in connection with an extension of credit is sufficient to prevent the discharge of the underlying debt. *Lincoln First Bank, N.A. v. Tomei (In re Tomei)*, 24 B.R. 204, 206 (W.D.N.Y.1982); *Bazemore v. Stehling*, 396 F.2d 701, 703 (5th Cir.1968). " 'It is sufficient if [the false statement] was a substantial factor in causing the [extension of credit].' " *In re Tomei*, 24 B.R. at 206 (quoting *In re Clancy*, 279 F.Supp. 820, 822 (D.Colo.1968), *aff'd*, 408 F.2d 899 (10th Cir.), *cert. denied*, 396 U.S. 958, 90 S.Ct. 430, 24 L.Ed.2d 422 (1969)).

■ The evidence shows that H & K received, reviewed and relied upon the Financial Statement. In fact, the Financial Statement was a vital component of H & K's decision to lease the Equipment. Although H & K relied upon other factors, such as a solid past business relationship with Branham and his companies and the ability to repossess the Equipment, the Financial Statement was a significant and important factor in H & K's decision to enter into leases with BDI, a new venture in which Branham said his brother was not involved.

The evidence discloses that H & K would not have entered into the three lease transactions had it known that Branham's net worth was less than $500,000. Believing his net worth to be at least one million dollars, H & K entered into the lease agreements. The Court thus concludes that H & K actually relied upon the Financial Statement in doing so.

### 2. *Reasonable Reliance*

The Court next must examine whether H & K's reliance on the Financial Statement was reasonable. Actual reliance or reliance in fact is a separate issue from a finding of "reasonable reliance." *Stan-*

*dard Fed. Bank v. Compton (In re Compton)*, 97 B.R. 970, 978 (Bankr.N.D.Ind. 1989). As one court has observed, "[t]here is no bright line test for reasonableness; therefore, there can be no other factual situations which would render reliance unreasonable." *Dominion Bank v. Wingo (In re Wingo)*, 112 B.R. 141, 145 (D.W.D. Va.1990). That court also stated:

> What must be kept in mind is Congress' intent in adding the "reasonableness" requirement to § 523(a)(2)(B). It seems to me that what Congress intended by incorporating the reasonable reliance requirement into § 523 was to prevent creditors from using a misrepresentation in a financial statement to prevent the debtors discharge when, in fact, the financial statement played no meaningful part in the decision of the creditor to extend credit. In other words, Congress was making it more difficult for creditors to use § 523 in order to argue that a claim is not dischargeable.

*See also In re Martin*, 761 F.2d at 1166. ("[T]he reasonableness of reliance isn't rigorous, but is to get at creditors acting in bad faith.") Congress "intended only that reliance not be successfully asserted in bad faith as a matter of convenience after the fact to avoid dischargeability." *Marquette Nat'l Bank v. Richards (In re Richards)*, 71 B.R. 1017, 1022 (Bankr.D.Minn.1987). The requirement is a "response to unscrupulous lenders who deliberately obtained false or insufficient financial statements to later use against the borrower during bankruptcy." *Id.* (citing S.Rep. No. 989, 95th Cong.2d Sess. 78 (1978); *reprinted in* 1978 *U.S.Code Cong. & Admin.News* 5787, 5864 [other citation omitted]).

■ Branham argues that a creditor has an affirmative duty to verify information contained in a financial statement. This very issue was addressed recently by the bankruptcy court in *Teates v. Kuranda (In re Kuranda)*, 122 B.R. 264 (Bankr.E.D. Va.1990). In that case, the Court stated:

> The requirement that the creditor's reliance be reasonable draws into question whether the creditor should investigate the financial statement prior to relying

on it. In *Sovran Bank, N.A. v. Allen (In re Allen)*, 65 B.R. 752 (E.D.Va.1986), *appeal dismissed sub nom. Sovran Bank, N.A. v. Allen*, 823 F.2d 548 (4th Cir.1987), the district court specifically rejected the imposition of a duty on a lender to investigate the financial statement, stating, "[t]his court must conclude, therefore, that Congress did not intend to include a verification requirement when it enacted section 523(a)(2)(B)(iii) of the Bankruptcy Code." *In re Allen*, 65 B.R. at 752.

*In re Kuranda*, 122 B.R. at 268–69. This conclusion has been consistently upheld by a number of courts. *See Marquette Nat'l Bank v. Richards*, 71 B.R. at 1020–23; *Capital City Bank & Trust v. Kroh (In re Kroh)*, 88 B.R. 987 (Bankr.W.D.Mo.1988); *Earls v. Southgate Bank and Trust Co. (Matter of Earls)*, 80 B.R. 978 (W.D.Mo. 1987). This Court agrees that it is reasonable for a creditor to assume that the financial statement is accurate when it is complete and contains no apparent inconsistencies. *See, e.g., Horowitz Finance Corp. v. Hall (In re Hall)*, 109 B.R. 149, 154 (Bankr. W.D.Pa.1990). Accordingly, there is no verification requirement imposed by § 523(a)(2)(B) upon lenders.

This raises the issue of verification if there are discernible, patent defects in a financial statement. The *Kuranda* court made the following apt observation on this issue:

> The conclusion that a lender does not have the duty to verify, however, does not give the lender a right to ignore glaring inconsistencies or blatant falsehoods in the statement. Where a creditor has been put on notice of the statement's inaccuracy, its reliance on that statement is unreasonable. A creditor cannot ignore "red flags" and expect to benefit from nondischargeability. *See Beneficial New York, Inc. v. Bossard (In re Bossard)*, 74 B.R. 730, 735 (Bankr. N.D.N.Y.1987). *See also Standard Federal Bank v. Compton (In re Compton)*, 97 B.R. 970, 979 (Bankr.N.D.Ind.1989); *Beneficial Finance Co. v. Jackson (In re Jackson)*, 32 B.R. 549, 552 (Bankr.E.D. Va.1983).

*In re Kuranda*, 122 B.R. at 269. Thus, if we are to accept the proposition of *Kuranda*, and the courts it has cited, a creditor may have a duty to inquire further into a financial statement with glaring inconsistencies or patent defects if its reliance is to be deemed reasonable.

■ Branham argues that H & K knew, or should have discovered, that the Financial Statement was both incomplete and inaccurate because it contains obvious defects. Branham argues further that H & K had an affirmative duty to verify the information contained in the Financial Statement because it contained obvious indications of unreliability. Finally, Branham contends that Hoffman knew or had reason to believe that the Financial Statement represented the joint assets and liabilities of John and Raymond Branham. Armed with this information, asserts Branham, H & K possessed a duty to verify the accuracy of the Financial Statement.

First, there is no evidence which would suggest or establish that H & K's pursuit of a nondischargeability determination based upon the Financial Statement is motivated by bad faith. The Court would agree that Hoffman was anxious to sell the Equipment—particularly the Challenger Rig—but had to settle for a lease arrangement because there were no potential purchasers for the rig at that time. Realizing that payment under the leases was to come from a new venture—BDI—which purportedly was owned and managed by Branham, Hoffman asked for and received Branham's Financial Statement. Hoffman considered the Financial Statement to be a crucial element in his decision on whether to lease the Equipment to BDI. Thus, the Financial Statement played a meaningful part in H & K's decision to lease the Equipment. It was not obtained, nor is it being used now, in bad faith.

The last question is whether H & K should have verified the Financial Statement because of knowledge Hoffman had about Branham's businesses or inaccuracies in the statement itself. It is true Hoffman knew that the Branham brothers

did business as B & B Enterprises and B & B Drilling. Transcript at 46. He also assumed that the lessee of the Equipment would be one of the Branham brothers' enterprises. Transcript, pp. 29–30. When Hoffman learned that John Branham would not be involved in the new venture, he agreed to review a copy of a financial statement which Branham had submitted to the Department of Natural Resources because it showed Branham's assets and liabilities. If Hoffman knew, or should have known, that the statement he received included the combined net worths of Raymond and John Branham, then his reliance might not be reasonable. However, if there were no reason for Hoffman to suspect that the Financial Statement included John Branham's assets and liabilities, H & K's reliance is reasonable.

Upon a thorough examination of the record, the Court can find no evidence supportive of a finding that Hoffman knew, or should have known, that the financial statement he received from Branham contained anything but a statement of Raymond Branham's individual financial condition. It contained no references to B & B Enterprises, B & B Drilling or John Branham; the statement only referenced Raymond Branham. Hoffman asked for Branham's personal financial statement and nothing on the document he received would suggest to him or any other businessperson that he got anything but what he had requested.

Hoffman did not know what type of financial statement Branham had earlier submitted to the Department of Natural Resources. He would not have known whether the Branham brothers submitted individual statements in connection with B & B Enterprises nor would he have known whether Raymond Branham submitted a financial statement to that department in connection with his new company, BDI. Thus, it was reasonable for Hoffman to conclude that the statement he got was Ray Branham's.

The so-called red flags are red herrings. There simply are no obvious or patent defects which should have caused Hoffman to be suspicious. It was reasonable for Hoffman to believe that Branham had a net worth of approximately $1.7 million considering his extensive experience as an operator in Ohio, and it was reasonable for Hoffman to determine in his own analysis a realistic discounted net worth of approximately one million dollars. It was reasonable for Hoffman to believe that Branham personally owned the Ingersoll–Rand drilling rig and 100 acres of real property, despite the fact that there was no accompanying description. And it was reasonable for Hoffman to accept the Financial Statement as a statement of Branham's financial condition even though it was not notarized. Financial statements are rarely notarized; the fact that this one is on a Department of Natural Resources form and had a blank space for notarization is of no consequence. It still operated as Branham's representation of his own net worth between April 24 and August 28, 1985. And finally, it would be unreasonable for H & K to review records of its separately operated subsidiary, H & P Insurance, to ascertain that insurance policies on the Ingersoll–Rand drilling rig somehow would lead H & K to conclude that someone other than Raymond Branham owned that equipment.

H & K acted in good faith in relying on the Financial Statement; Raymond Branham submitted it in bad faith. The fact that H & K partially relied on other factors does not make unreasonable its reliance on the Financial Statement. The uncontroverted evidence is that H & K did rely on the Financial Statement and that such reliance was reasonable.

### V. *Conclusion*

Exceptions to discharge are to be construed narrowly. *Bank One v. Huffman (In re Huffman)*, 45 B.R. 590, 595 (Bankr.N.D.Ohio 1984). Moreover, "the principles of the Bankruptcy Code generally, and the discharge provisions in particular, are to provide the honest but unfortunate debtor a new opportunity in life and a clear field for future effort." *In re Patch*, 24 B.R. 563 (D.Md.1982). This fresh start is reserved, however, for the honest debtor.

In this case, the debtor "doctored up" an old financial statement, signed it, and sub-

mitted it to the plaintiff as an inducement to obtain credit and property. The statement was materially false and was submitted with the intent to deceive the plaintiff. The plaintiff reasonably relied on the statement and was damaged thereby.

Thus, Branham is not entitled to the fresh start contemplated for the honest debtor. Instead, his fraud in obtaining property and credit mandates a denial of the discharge of his debt to the plaintiff. Accordingly, the relief sought in the complaint is hereby GRANTED and the debtor's debt to the plaintiff is deemed nondischargeable in his bankruptcy case. Judgment shall be entered in accordance with this determination.

IT IS SO ORDERED.